No. 05-013

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 203

_____

STATE OF MONTANA,

        Plaintiff and Respondent,

    v.

PETER OLIVER JOSEPH BARNABY,
a/k/a PETER OLIVER BUTTERFLY,

        Defendant and Appellant.

_____

APPEAL FROM:    District Court of the Twentieth Judicial District,
                     In and for the County of Lake, Cause No. DC 02-121
                     The Honorable Deborah Kim Christopher, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

        William F. Hooks, Attorney at Law, Helena, Montana

        For Respondent:

        Hon. Mike McGrath, Attorney General; Joslyn M. Hunt, Assistant
        Attorney General, Helena, Montana

        Robert J. Long, Lake County Attorney; Mitch Young, Deputy County
        Attorney, Polson, Montana

_____

                Submitted on Briefs:  January 11, 2006

                       Decided:  August 23, 2006

Filed:

_____
                Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1     Peter Barnaby (Barnaby) appeals from his conviction in the Twentieth Judicial District, Lake County, for operation of a clandestine laboratory. We affirm in part, reverse in part, and remand for further proceedings.

¶2     We review the following issues on appeal:

¶3     Whether the District Court properly denied Barnaby's motion to suppress evidence discovered during the search of his residence.

¶4     Whether the District Court properly denied Barnaby's *Batson* challenge.

¶5     Whether the District Court properly considered alternatives to imprisonment when sentencing Barnaby, a first time nonviolent felony offender.

### FACTUAL AND PROCEDURAL BACKGROUND

¶6     Narcotics officers suspected the operation of a methamphetamine laboratory at Barnaby's residence involving June Sheridan (Sheridan). Officer Louis Fiddler (Officer Fiddler), a Flathead Tribal Police Narcotics Investigator, applied for a warrant to search Barnaby's residence on February 11, 2002.

¶7     The application for a warrant begins with information pertaining to Sheridan's knowledge of how to manufacture methamphetamines. A confidential informant reported in February of 2000 that he and Corey Minez (Minez) had been taught to make methamphetamines by Ferren Galpin (Galpin). The police arrested Minez for the production of methamphetamines on March 10, 2000. Minez confessed that he had been taught how to manufacture methamphetamines by Galpin and informed the police that Galpin also had taught Sheridan how to produce methamphetamines.

2

¶8      A concerned citizen contacted investigators "in reference" to Sheridan manufacturing methamphetamines in July of 2000. The warrant application uses the terms "concerned citizen" and "citizen informant" interchangeably. We, too, use the terms interchangeably for the purposes of this opinion. The citizen reported from first-hand knowledge and personal observations that Galpin had taught Sheridan how to produce methamphetamines. The application stated that Galpin is now serving a lengthy sentence after being convicted for the production of methamphetamines.

¶9      The application contains several reports that detail Sheridan's efforts to obtain the ingredients used in the production of methamphetamines. Employees at a Target store in Missoula detained Sheridan for the attempted shoplifting of five boxes of suphedrine tablets on May 18, 2001. Sheridan confessed to a police officer and Target employee that she had attempted to steal the tablets. Sheridan admitted that she had stolen several boxes of suphedrine tablets from Target in the past.

¶10     Officer Fiddler spoke with a citizen informant on July 18, 2001, who had been involved with Sheridan. The citizen reported to Officer Fiddler that Sheridan had lived on his property for some period of time. The citizen had found a box labeled "June's Stuff" on his property that contained acetone, red devil lye, toluene, coffee filters, and several "hot plates." Officer Fiddler stated in the application that he knew from his training and experience that those items are used in the production of methamphetamines. The citizen also reported that his closet had been stained brown during the time that Sheridan had lived on his property. Officer Fiddler stated in the application that materials are commonly stained brown during the production of methamphetamines. The

citizen informed Officer Fiddler that he found empty suphedrine boxes in Sheridan's vehicle and that he believed that Sheridan concealed the items used to produce methamphetamines in the trunk of her car because Sheridan would never allow him to be close to it.

¶11 A drug force agent observed Sheridan purchasing two cans of toluol from a hardware store in Ronan on October 17, 2001. The application stated that toluol constitutes a known ingredient in the production of methamphetamines.

¶12 A tribal police officer advised Officer Fiddler on November 5, 2001, of information concerning the home of Sheridan's parents. The officer stated that Sheridan had been responsible for watching her parent's house for two weeks while they were out of town. Sheridan's parents became ill with sinus problems shortly after they returned home. Officer Fiddler stated in the application that based on his experience he knows that it is common for people to have sinus problems when they are exposed to a location where the production of methamphetamines has taken place.

¶13 The application contains the reports of two concerned citizens who reported that Sheridan operated a methamphetamine laboratory at Barnaby's residence. A concerned citizen contacted Officer Fiddler on November 7, 2001, to report that Sheridan lived with a "Peter or Joe" Barnaby at Barnaby's house near Coldwater Lane. The concerned citizen believed that Sheridan operated a methamphetamine lab at Barnaby's residence. The application did not state the source of the citizen's information. Another citizen informant contacted Officer Fiddler on November 28, 2001, to report that Sheridan operated a methamphetamine lab at Barnaby's house. The application again failed to

4

state the source of the citizen's information.

¶14 An agent with the drug task force contacted a local pharmacist in January of 2002 to determine whether the pharmacist knew of any people who had been purchasing large amounts of pseudoephedrine or ephedrine products. The application stated that pseudoephedrine and ephedrine are known to be essential ingredients in the production of methamphetamines. The employee reported that Sheridan visited the store at least once a week to purchase ephedrine products. The pharmacist also reported that she suspected Sheridan of the illicit use of ephedrine products due to certain indicators. The pharmacist reported that Sheridan appeared "jittery," had bags under her eyes, and always paid in cash. The pharmacist knew these indicators of methamphetamine use as the result of speaking with a drug task force agent on a previous case.

¶15 The application stated that Officer Fiddler made contact with a concerned citizen on January 17, 2002, who personally viewed a series of odd events at Barnaby's residence after Sheridan's arrival. The citizen reported that he knew of Sheridan's arrival at Barnaby's house by the presence of Sheridan's car, a gray 1987 Cougar. The citizen reported that he knew Sheridan from living in the Arlee area and also knew that the vehicle belonged to her. The citizen reported that Sheridan's vehicle had spent a lot of time at the Barnaby residence over the previous two months.

¶16 The concerned citizen reported that unusual activities had been occurring at the Barnaby residence since the arrival of Sheridan's vehicle. The citizen reported heavy traffic to and from the Barnaby residence at all hours of the day and night, with visitors staying only for a short amount of time. The concerned citizen observed someone back

Sheridan's vehicle up to the door of Barnaby's house and then unload various items from the trunk. The citizen further stated that Barnaby had built a makeshift barrier out of tarps and plastic to prevent neighbors from seeing Barnaby and Sheridan unloading items from Sheridan's car. The barrier also prevented the citizen from viewing some movement around the property. The citizen reported that before Sheridan's arrival, Barnaby burned a fire outside his home only once or twice a year for the purposes of heating a sweat lodge, but now a fire burned almost constantly. The fire always burned during periods of strange activity at the house.

¶17 The warrant application stated that all of the persons mentioned in the application had given reliable information in the past. They had all been proven reliable with corroborating information that resulted in arrests from the information they provided. The application further stated that all of the above informants operated separate and apart from each other, and were not aware of the other's participation. The application for a warrant did not distinguish between confidential informants, citizen informants, and concerned citizens.

¶18 Judge McNeil apparently signed the warrant on February 11, 2002, although the warrant was dated February 11, *2001*. The warrant authorized officers to search a residence identified as 21 Coldwater Drive. Officers conducted a search of Barnaby's residence pursuant to the warrant two days later. The search revealed various items used in the production of methamphetamines and other drug paraphernalia. The State charged Barnaby and Sheridan with operating a clandestine laboratory in violation of § 45-9-132, MCA, on September 19, 2002.

¶19    Barnaby and Sheridan moved separately to suppress the evidence discovered during the search before trial based upon a lack of probable cause to search Barnaby's residence.  Both argued that the search was invalid due to the fact that Judge McNeil signed the warrant in 2001 and the officers conducted the search in 2002.  The District Court agreed with the State that Judge McNeil likely had made a typographical error and actually had signed the warrant on February 11, 2002.  Both also challenged the warrant's validity on the grounds that it authorized the officers to search a residence located at 21 Coldwater Drive, while Barnaby's house is located at 1-12 Coldwater Lane.

¶20    Officer Fiddler testified at the suppression hearing as to how he had determined Barnaby's address using a police database compiled through emergency responses.  Officer Fiddler further testified that he had grown up in the area and he had known the location of Barnaby's house since he was a child.  Officer Fiddler also attached a map of the area and a photograph of the house to the warrant application that described how to reach the house.  Finally, Officer Fiddler testified that the low density of housing in the area, "maybe five, six" per square mile, made misidentification of the house unlikely.  This evidence satisfied the District Court that the warrant correctly described the house to search.

¶21    Barnaby's motion also argued that much of the information contained in the application for a warrant pertained solely to Sheridan, and that such information did not provide probable cause to search his residence.  Barnaby further contended that the information that did concern his residence did not amount to sufficient evidence to establish probable cause.  Sheridan's motion also challenged the factual predicates used

7

to establish probable cause to support the issuance of the warrant. She alleged that the police had failed to corroborate adequately information received from informants. The State's response brief asserted that Officer Fiddler had stated in the warrant application that each person listed in the warrant application had provided reliable information in the past. Neither Barnaby nor Sheridan filed a reply brief to challenge this assertion.

¶22 At Barnaby's request, the District Court combined his suppression hearing with Sheridan's after he attested that "at least exactly the same witnesses, if not exactly the same evidence" would be presented. Counsel for Sheridan and Barnaby relied on the arguments made in Sheridan's brief in support of her motion to suppress regarding the State's lack of corroboration. Barnaby explicitly joined in the arguments made in Sheridan's brief. Their questioning of Officer Fiddler at the suppression hearing centered on the address listed in the warrant application. The District Court denied Barnaby's motion to suppress.

¶23 The case then proceeded to jury selection. The State exercised two peremptory challenges to remove tribal members, Mary Lefthand (Lefthand) and Ronda Michell (Michell). Lefthand had stated during voir dire that Barnaby's father was her adopted brother. Michell stated that she considered Barnaby's counsel, Joey Jayne (Jayne), a good friend. Barnaby also used a peremptory challenge to remove a tribal member from the jury, Steven DuPuis (DuPuis).

¶24 Barnaby then objected to the State's use of peremptory challenges in chambers. Defense counsel argued that the State improperly removed Lefthand and Michell from the venire based solely upon their race in violation of the rule set forth in *Batson v.*

8

*Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69. The State responded by explaining that it had struck Lefthand because of her relationship to the defendant, and Michell because she was a close friend of Barnaby's attorney. The District Court also noted that Barnaby's counsel had struck DuPuis from the venire. The District Court overruled Barnaby's *Batson* objection.

¶25   The jury convicted Barnaby of operating a clandestine laboratory. Barnaby filed a motion for a new trial contending that the District Court had improperly denied his *Batson* objection. The District Court denied Barnaby's motion in a written order. The court explained that the record clearly indicated that of the two tribal members challenged by the State, one considered herself a good friend of Barnaby's attorney, and the other was related to Barnaby. The District Court further explained its rationale for denying the motion by noting that the State did not challenge another tribal member, DuPuis.

¶26   The District Court held a sentencing hearing on October 21, 2004. Defense argued for alternatives to imprisonment in light of the fact that Barnaby was a nonviolent first time offender according to § 46-18-225, MCA. Defense counsel recommended that Barnaby receive a term at the Department of Corrections. The State recommended a sentence of ten years at the Montana State Prison, with five suspended. The District Court sentenced Barnaby to eight years at the Montana State Prison, with three suspended.

¶27   Barnaby objected to the sentence on the basis that the District Court did not adequately consider alternatives as required by § 46-18-225, MCA. The District Court

9

responded that it had adequately considered the alternatives to imprisonment. The written sentencing order issued by the District Court stated the court had taken into account the nature of the offense in this matter for which the court has significant concerns and Barnaby's lack of any prior felony record. The District Court also stated that it imposed a prison sentence to provide punishment to Barnaby with an opportunity for his rehabilitation. The order did not mention any of the criteria contained in § 46-18-225, MCA. This appeal followed.

## DISCUSSION

¶28 Barnaby contends that the District Court improperly denied his motion to suppress evidence as the search of his residence was not supported by probable cause. He also argues that the District Court improperly denied his *Batson* objection. Finally, Barnaby maintains that the District Court failed to consider adequately alternatives to imprisonment when imposing his sentence.

### Motion to Suppress

¶29 We have adopted the "totality of the circumstances" test set forth in *Illinois v. Gates* (1983), 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527, to evaluate whether probable cause supported the issuance of a warrant. *State v. Reesman*, 2000 MT 243, ¶ 24, 301 Mont. 408, ¶ 24, 10 P.3d 83, ¶ 24. Under the totality of the circumstances test, the issuing judicial officer must make a practical, common sense determination, given all the evidence contained in the application for a search warrant, whether a fair probability exists that contraband or evidence of a crime will be found in a particular place. *Gates*, 462 U.S. at 238, 103 S.Ct. at 2332.

¶30     An application for a search warrant must state facts sufficient to show probable cause for the issuance of a warrant. A determination of probable cause does not require facts sufficient to make a showing of criminal activity, rather, the issuing judicial officer must only determine that there exists a probability of criminal activity. *State v. Rinehart* (1993), 262 Mont. 204, 210, 864 P.2d 1219, 1222. Probable cause must be determined solely from the information contained within the four corners of the search warrant application. *Rinehart*, 262 Mont. at 211, 864 P.2d at 1223. Our function as a reviewing court is to ensure ultimately that the issuing judicial officer had a "substantial basis" to determine that probable cause existed. *Reesman*, ¶ 19.

¶31     The application for a search warrant begins with credible information of Sheridan's involvement in the production of methamphetamines. A concerned citizen reported from first-hand knowledge and personal observations that Galpin, a well-known methamphetamine manufacturer, taught Sheridan how to produce methamphetamines. The first-hand report of a concerned citizen generally represents reliable information. *State v. Oleson*, 1998 MT 130, ¶ 14, 289 Mont. 139, ¶ 14, 959 P.2d 503, ¶ 14 (*overruled in part on other grounds by State v. Kuneff*, 1998 MT 287, ¶ 19, 291 Mont. 474, ¶ 19, 970 P.2d 556, ¶ 19). Minez also reported that Galpin taught Sheridan how to manufacture methamphetamines.

¶32     The application then charts a continuing course of action by Sheridan to gather and possess the materials used to manufacture methamphetamines through the first-hand reports of several reliable sources. Sheridan had been arrested shoplifting several boxes of suphedrine tablets from a Target store and admitted to a police officer and Target

employee that she had successfully shoplifted several boxes of tablets on previous occasions. A citizen informant reported finding a box labeled "June's Stuff" that contained several items used in the production of methamphetamines. A narcotics officer witnessed Sheridan purchasing two cans of toluol from a hardware store. A local pharmacist observed that Sheridan purchased ephedrine tablets at least once a week and reported that Sheridan had the physical appearance of a person using methamphetamines.

¶33 Barnaby contends that evidence of Sheridan's involvement in the production of methamphetamines does not establish probable cause to search his residence. We agree that it does not follow in all cases, "simply from the existence of probable cause to believe a suspect guilty, there is also probable cause to search his residence." *State v. Kaluza* (1993), 262 Mont. 360, 362, 865 P.2d 263, 264 (*citing United States v. Valenzuela* (9th Cir. 1979), 596 F.2d 824, 828). "But it is also clear that interpreting a search warrant in the proper 'commonsense and realistic fashion' may result in the inference of probable cause to believe that criminal objects are located in a particular place." *Valenzuela*, 596 F.2d at 828 (citation omitted).

¶34 The evidence of Sheridan's involvement with methamphetamines must be considered along with the other information contained in the application. *See State v. St. Marks*, 2002 MT 285, ¶ 23, 312 Mont. 468, ¶ 23, 59 P.3d 1113, ¶ 23; *State v. Gray*, 2001 MT 250, ¶ 11, 307 Mont. 124, ¶ 11, 38 P.3d 775, ¶ 11. A concerned citizen contacted Officer Fiddler on January 17, 2002, to report that he personally viewed Sheridan's car spending a lot of time at the Barnaby residence over the previous two months. The citizen stated that he knew Sheridan from the Arlee area and knew the car that she drove.

That report constitutes reliable information of Sheridan's frequent presence at Barnaby's residence. *Oleson*, ¶ 14. The report of a separate concerned citizen who contacted Officer Fiddler on November 7, 2001, also contained information that Sheridan resided at least part-time at Barnaby's.

¶35 The information pertaining to Sheridan possesses probative value when determining whether a fair probability exists that the items used in the manufacturing of methamphetamines may be found at Barnaby's residence. "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily* (1978), 436 U.S. 547, 556, 98 S.Ct. 1970, 1976-77, 56 L.Ed.2d. 525. We deemed it appropriate in *Gray*, ¶ 21, to impute to Gray suspicious activity engaged in by his companion, Wallace, in assessing probable cause. Similarly in *St. Marks*, ¶ 38, we determined that corroboration of criminal conduct by St. Mark's companion, Torres, could be imputed to St. Marks. The same holds true for corroboration of Sheridan's conduct in this case.

¶36 We emphasize that Sheridan's mere presence at the house does not amount to sufficient probable cause to search Barnaby's residence. *See Kaluza*, 262 Mont. at 362, 865 P.2d at 264. The information relating to Sheridan's involvement with methamphetamines and presence at Barnaby's is not so compelling that it establishes probable cause of Barnaby's own involvement in manufacturing methamphetamines. The information may support a conclusion that the instruments used to manufacture methamphetamines may be found at Barnaby's residence, however, when considered in

13

combination with other information under the totality of the circumstances test. *See State v. Holstine* (1993), 260 Mont. 310, 315, 860 P.2d 110, 113.

¶37 The information pertaining to Sheridan must be evaluated in conjunction with the information specifically related to suspicious and illegal activities at Barnaby's residence. A concerned citizen contacted Officer Fiddler on November 7, 2001, to report that they believed that Sheridan operated a methamphetamine laboratory at Barnaby's residence. A separate citizen informant contacted Officer Fiddler on November 28, 2001, to report that Sheridan operated a methamphetamine laboratory at Barnaby's residence. The January 17, 2002, report of the concerned citizen who reported Sheridan's presence at Barnaby's house also reported personally viewing a series of suspicious activities since Sheridan's arrival. The citizen reported that he observed, among other things, heavy traffic to and from the Barnaby residence at all hours of the day and night with visitors staying only for a short amount of time; that someone backed Sheridan's car all the way to the door of the house to unload items from the trunk; and a barrier had been built on the residence to hide movement on the property and block anyone from further viewing items being unloaded from the trunk.

¶38 Barnaby uses a "divide and conquer" approach for evaluating the sufficiency of the application for a warrant. After dismissing the information concerning Sheridan as an insufficient basis for probable cause, Barnaby engages in a mechanical application of *Reesman* to evaluate separately the reports of the three concerned citizens. Barnaby argues that the reports of the concerned citizens who contacted Officer Fiddler on November 7, 2002, and November 28, 2002, provide no support in a probable cause

analysis as the warrant application fails to state whether the citizens based the information on their own personal observations. *See Reesman*, ¶ 29. Barnaby maintains that the report of the concerned citizen on January 17, 2002, required independent corroboration because the warrant application failed to describe the circumstances under which the information became known, despite the application explicitly stating that the concerned citizen personally observed the events described in the warrant. *Oleson,* ¶ 14. Moreover, he claims that this last report does not allege any illegal activity, but merely alleges "odd events" and "strange activity." We disagree.

¶39     The critical question when evaluating probable cause is not whether an individual report meets the requirements of a particular test, but whether the application as a whole states sufficient facts to support a determination of probable cause. *See Gates*, 462 U.S. at 230-231, 103 S.Ct. at 2328. Factors that possess little probative value on their own, when considered under the totality of the circumstances test, can provide support for a determination of substantial evidence to conclude probable cause existed when considered in combination with other information. *Holstine*, 260 Mont. at 315, 860 P.2d at 113. We must determine whether all the information in the application—Sheridan's involvement in the production of methamphetamines, her continued presence at Barnaby's house, the two reports that Sheridan operated a methamphetamine laboratory at Barnaby's house, and the report of suspicious activity at Barnaby's house since Sheridan's arrival—amounts to a substantial basis for determining whether probable cause supported the issuance of a warrant. *Gates*, 462 U.S. at 238-239, 103 S.Ct. at 2332.

¶40     Barnaby's method of evaluating a warrant urges this Court to take a step away

from the totality of the circumstances test in favor of the application of a three-prong test reminiscent of the long discarded two-prong test of *Aguilar-Spinelli*. *See Aguilar v. Texas* (1964), 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723; *Spinelli v. United States* (1969), 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637. In *Gates*, the Court rejected the two-prong test of "reliability" and "basis of knowledge" holding that the elements should not "be understood as entirely separate and independent requirements to be rigidly exacted in every case." *Gates*, 462 U.S. at 230, 103 S.Ct. at 2328. Barnaby's approach rigidly evaluates the "reliability" and "basis of knowledge" of an individual informant and then mandates whether independent corroboration is required, without regard to any other information that might be contained in the application. This method conflicts with the totality of the circumstances approach by forcing a judicial officer to apply a strict test to evaluate each element in a warrant separately rather than allowing the judicial officer to consider the information as a whole when determine probable cause.

¶41 The first Dissent argues that our holding undermines *Reesman*. Dissent, ¶¶ 61-71. We concede that this case deviates slightly from our decision in *Reesman* as we cannot easily reconcile *Reesman's* strict rules requiring independent police corroboration with the flexibility of the totality of the circumstances test. Probable cause poses a fluid concept turning on the assessment of probabilities in a particular factual context, "not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232, 103 S.Ct. at 2329. *Reesman* still provides useful guidelines to evaluate a warrant application, however, the guidelines become impractical in cases such as this, where the police receive reliable reports from several concerned citizens yet no single report

16

satisfies all the *Reesman* criteria.

¶42    We do not disturb the principle that independent police corroboration represents a key element in determining whether probable cause exists to issue a warrant. We also admonish police officers to corroborate independently information from sources of questionable reliability. *See Gates*, 462 U.S. at 241-42, 103 S.Ct. at 2334. We simply determine that the proposition set forth in *Reesman* that independent police work represents the only method of corroboration under the totality of the circumstances test is wrong as a matter of law. Two justices specially concurred and one dissented from the majority's opinion in *Reesman* because of this very issue. *Reesman*, ¶ 49, ¶ 80.

¶43    Justice Regnier joined the Court in determining that no probable cause existed to support the decision of the judicial officer to issue a warrant. *Reesman*, ¶ 49. Justice Regnier in his concurring opinion rejected as "too restrictive," however, the Court's notion that corroboration must be accomplished through police investigation. *Reesman*, ¶ 49 (Regnier, J., concurring). He emphasized that "corroboration could be accomplished by other means" than police investigation. *Reesman*, ¶ 58 (Regnier, J., concurring). Justice Regnier recognized that the Court's myopic focus on "police investigation" diverts the judicial officer's attention from the more important question of whether the warrant application establishes probable cause for the search. *Reesman*, ¶ 58 (Regnier, J., concurring).

¶44    The second Dissent, ¶¶ 72-191, mischaracterizes our holding as overruling or calling into doubt an array of precedents that relate to this decision only in that each affirms a finding of probable cause to issue a search warrant. For example, *State v.*

*Meyer*, 2004 MT 272, ¶¶ 25, 31, 323 Mont. 173, ¶¶ 25, 31, 99 P.3d 185, ¶¶ 25, 31, is the first in a string of cases cited by the Dissent as being overruled or called into doubt. We strike not even a glancing blow upon the continued vitality of *Meyer*. The Dissent cites two paragraphs in *Meyer* that discuss issues that we do not even tangentially address: the timeliness of a warrant application and the proposition that we deem as reliable an informant that makes a statement against their interest. *Meyer*, ¶¶ 25, 31.

¶45 Our decision similarly strikes no blow on the continued vitality of other cases that cite *Reesman*. *See, e.g., State v. Bowman*, 2004 MT 119, ¶ 30, 321 Mont. 176, ¶ 30, 89 P.3d 986, ¶ 30 (using *Reesman* guidelines to determine that game warden corroborated anonymous tip by learning from taxidermist that bullet had pierced cape from bull elk); *State v. Olson*, 2003 MT 61, ¶¶ 25-27, 314 Mont. 402, ¶¶ 25-27, 66 P.3d 297, ¶¶ 25-27 (using *Reesman* guidelines to determine that report of non-anonymous, concerned citizen who witnessed meth lab provided sufficient probable cause to support warrant); *State v. Grams*, 2002 MT 188, ¶¶ 17-19, 311 Mont. 102, ¶¶ 17-19, 53 P.3d 897, ¶¶ 17-19 (using *Reesman* to conclude that five informants' reports based on personal observations against their interest provided adequate basis for warrant). We fully agree that the reliable reports in those cases constituted sufficient probable cause to support a search warrant. We simply overrule an unduly restrictive rule that never should have been imposed under the long-established and flexible totality of the circumstances test. *Gates*, 426 U.S. at 230-231, 103 S.Ct at 2328 (defining probable cause as a practical nontechnical concept more appropriately defined by the totality of circumstances approach than any rigid demand that specific tests be satisfied for every informant's tip).

¶46 We conclude that the District Court properly denied Barnaby's motion to suppress. The issuing judicial officer had a substantial basis for determining that probable cause existed to search Barnaby's residence considering together all the information provided in the warrant under the totality of the circumstances test. The warrant contained highly credible evidence of Sheridan's involvement in the production of methamphetamines and her presence at Barnaby's residence. Two separate concerned citizens contacted Officer Fiddler to report that Sheridan operated a methamphetamine laboratory at Barnaby's residence. Another concerned citizen personally viewed a series of suspicious activities at Barnaby's residence following Sheridan's arrival. The fact that the application for a warrant did not include a specific account of the circumstances under which some informants viewed the events, or whether the two citizens based their reports on personal observations, does not preclude a court from finding probable cause. The information relating to Sheridan and the reports of concerned citizens provide a basis for finding probable cause in this case, although none of the reports, on its own, satisfy the *Reesman* criteria.

### *Batson* Challenge

¶47 Barnaby next contends that the District Court improperly denied his *Batson* challenge. We will defer to the trial court's findings of fact unless clearly erroneous, when considering a trial court's ruling on a challenge that a litigant has exercised its use of peremptory challenges in a discriminating manner, and will review the trial court's application of law de novo. *State v. Ford*, 2001 MT 230, ¶ 7, 306 Mont. 517, ¶ 7, 39 P.3d 108, ¶ 7.

¶48	*Batson* set out a three-prong test to determine whether the State exercised its peremptory challenges in a discriminatory manner. First, the defendant must make out a prima facie case of purposeful discrimination. *Ford*, ¶ 16. To make a prima facie case, the defendant must show that he or she belongs to a cognizable racial group. *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723. The defendant may then rely on the fact that peremptory challenges constitute a jury selection practice that allows those to discriminate who are of a mind to discriminate. *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723. The defendant must then show that these facts, and any other relevant circumstances, raise an inference that the State used that practice to exclude members of the venire from the petit jury on account of their race. *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723.

¶49	Once the defendant makes a prima facie case for discrimination, we proceed to the second step, where the State must provide a race-neutral explanation for its use of peremptory strikes. *Ford*, ¶ 16. Finally, the trial court then will determine if the defendant has established purposeful discrimination. *Ford*, ¶ 16.

¶50	Barnaby objected immediately after the State removed Lefthand and Michell from the venire. The District Court did not rule whether Barnaby had presented a prima facie case for discrimination. Nevertheless, the State provided its explanations for striking the jurors. The District Court did not rule on the sufficiency of the State's justifications, but noted for the record that the State did not strike DuPuis, a tribal member, from the venire and overruled Barnaby's objection.

¶51	Barnaby contends that the District Court improperly applied the third step of the *Batson* test. Barnaby characterized the District Court's denial of his challenge as based

upon the court's finding that the State did not strike DuPuis from the venire. Barnaby correctly points out that a court may not deny relief simply because the State did not strike all members of a particular race from the jury under *Batson*. *See United States v. Harris* (6th Cir. 1999), 192 F.3d 580.

¶52 Whether a party presented a case of purposeful discrimination represents a factual question, thus we will defer to the trial court's findings of fact unless clearly erroneous. *See Ford*, ¶ 18 (holding that an appellate court will defer to the trial court's findings unless clearly erroneous). Therefore, the trial court must develop fully a record for review – a record that includes all relevant facts and information relied upon by the trial court to render its decision, as well as a full explanation of the court's rationale. *Ford*, ¶ 18.

¶53 Our review of the record demonstrates that the District Court properly overruled Barnaby's objection based, in large part, on the race neutral explanations provided by the prosecutor. The State provided race neutral explanations for both Lefthand and Michell according to the second step of *Batson*. *See Ford*, ¶ 16. It explained that it used a peremptory challenge on Michell because she considered Barnaby's trial attorney a good friend. The State removed Lefthand because Barnaby's father is her adopted brother. The District Court admitted into evidence notes taken by the State during voir dire to support its race-neutral explanations. The District Court then noted that Barnaby's counsel removed DuPuis. Thus, the fact that the State did not strike DuPuis represents only one of several relevant facts that the District Court considered in overruling Barnaby's objection.

21

¶54    Although the District Court developed a record at the time of Barnaby's objection that included all relevant facts, the court failed to provide a full explanation of its rationale for overruling the *Batson* objection as required by *State v. Parrish*, 2005 MT 112, ¶ 19, 327 Mont. 88, ¶ 19, 111 P.3d 671, ¶ 19.  The District Court simply overruled Barnaby's objection after hearing the State's explanations and noting that the State did not strike DuPuis.  This full explanation proves necessary to our review of the merits of any *Batson*-type challenge.  *Parrish*, ¶ 19.

¶55    We admonish the District Court to provide more detailed reasoning for the basis of denying a *Batson* challenge, even in cases where the defendant simply objects to the State's use of peremptory challenges instead of specifically invoking the *Batson* language.  We uphold the District Court's decision, however, because the court overruled Barnaby's *Batson* objection before our ruling in *Parrish*.  Furthermore, the record demonstrates that the State provided highly credible race-neutral explanations.  We remind district courts to follow the procedural mandate of *Ford* and *Parrish* to build a record and provide a full explanation for the denial of a *Batson* challenge in future cases to permit this Court to review adequately the denial of such a challenge on appeal.

Sentence

¶56    Barnaby finally contends that the District Court failed to consider adequately alternatives to imprisonment under § 46-18-225, MCA.  We review a district court's imposition of a criminal sentence for legality.  We review the trial court's interpretation on sentencing questions regarding statutory interpretation to determine whether it is correct.  *State v. McDanold*, 2004 MT 167, ¶ 12, 322 Mont. 31, ¶ 12, 97 P.3d 1076, ¶ 12.

22

¶57 Barnaby is a nonviolent first time felony offender. A "nonviolent felony offender" is a person who has committed a felony other than a "crime of violence" as defined by § 46-18-104(2), MCA. The operation of a clandestine laboratory in violation of § 45-9-132, MCA, does not fall within any of the definitions of a "crime of violence." *See* § 46-18-104(2), MCA. We recognize that operation of a clandestine laboratory constitutes a "violent offense" under the Sexual or Violent Offender Registration Act. Section 46-23-502(9)(a), MCA. That act's inclusion of operation of a clandestine laboratory as one of the specifically enumerated "violent offenses" does not affect the classification of Barnaby as a "nonviolent felony offender." The terms "crime of violence" and "violent offense" relate to separate statutes that serve different purposes and as a consequence, do not encompass the identical set of crimes.

¶58 Section 46-18-225(1), MCA, requires a district court first to consider alternatives to imprisonment when sentencing a "nonviolent felony offender." A district court must examine the sentencing criteria in § 46-18-225(2), MCA, in considering alternatives to imprisonment. *See State v. Pence* (1995), 273 Mont. 223, 231, 902 P.2d 41, 46. The statute further requires that if a district court sentences such an offender to prison, the judge shall state the reasons why it did not select an alternative to imprisonment, based on the criteria of § 46-18-225(2), MCA. Section 46-18-225(3), MCA; *Pence*, 273 Mont. at 231, 902 P.2d at 46.

¶59 The District Court stated that it imposed a prison sentence because of the nature of the offense, Barnaby's lack of any prior felony record, and to provide punishment with an opportunity for rehabilitation. The District Court failed to mention, however, any of the

23

criteria set forth in § 46-18-225(2), MCA, and fails to discuss why, when considering those factors, it deemed inappropriate an alternative to imprisonment. Thus, we vacate that portion of Barnaby's sentence and remand for further consideration of his sentence in light of the criteria set forth in § 46-18-225, MCA.

¶60    Affirmed in part and remanded in part for further proceedings.


/S/ BRIAN MORRIS


We Concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE



Justice Patricia O. Cotter dissents.

¶61    I dissent from the Court's disposition of Issue 1. Because I would reverse the District Court's denial of Barnaby's motion to suppress the evidence discovered during the search of his home, I would not reach Issues 2 and 3.

¶62    There was a multitude of miscellaneous information cited in the Application for Search Warrant to suggest that Sheridan knew how to cook methamphetamine, and that she had been observed purchasing or in possession of the precursors to methamphetamine on more than one occasion. However, assuming the Application contained all relevant information, at no time during the nearly two years of investigation leading up to the

24

search of Barnaby's home were the tribal police alerted that Sheridan was engaged somewhere in the actual manufacture of methamphetamine. And I submit that, given the sparse and unreliable information these officers possessed concerning Barnaby, there was no probable cause to support the conclusion that a lab was located in his home.

¶63 The Application reflects that a concerned citizen "reported" that Sheridan was "living with a Barnaby," and that he/she "believed" that Sheridan was operating a methamphetamine lab at his residence. Then, a "citizen informant" reported that Sheridan was operating a methamphetamine lab at the Barnaby residence. As the Court concedes at ¶ 13, the Application did not state the source of either citizen's information, nor did it indicate whether either person had personally observed the lab operation.

¶64 The sole remaining allegations involving Barnaby, as detailed in ¶¶ 15-16 of the Court's Opinion, summarize activities ostensibly observed on Barnaby's property that, standing alone, were neither unlawful nor illegal. The Court cites as persuasive the fact that Barnaby apparently took steps to prevent neighbors from observing his activities. Ironically, we have held that the steps taken by a person to prevent observation of his or her activities constitutes evidence of an actual expectation of privacy, a reasonable and lawful goal. See *State v. Bullock* (1995), 272 Mont. 361, 384, 901 P.2d 61, 74-75, and *State v. Siegal* (1997), 281 Mont. 250, 274-75, 934 P.2d 176, 190, *overruled in part and on other grounds by State v. Kuneff*, 1998 MT 287, 291 Mont. 474, 970 P.2d 556. Here, however, we conclude that such conduct contributes to a finding of probable cause to search his home.

¶65    In *Reesman*, this Court analyzed the several possible sources of an informant's information. From this analysis emerged a three-prong test that has repeatedly been used by this Court to determine whether probable cause exists for the issuance of a search warrant:

> 1) Was the informant anonymous or was the information provided hearsay? If so, independent corroboration of his or her information is required;
>
> 2) If the informant was not anonymous, was the information provided based on personal observation of criminal activity or was the information hearsay? If hearsay, independent corroboration is required; and
>
> 3) If the information from a non-anonymous informant was gathered by personal observation of criminal activity, was the informant reliable?

*Reesman, ¶¶* 28-31. Here, the Application does not tell us whether the "concerned citizen" was anonymous, nor does it relate that the information provided by *either* citizen was based on personal knowledge. Thus, under *Reesman* and its considerable progeny*, independent corroboration of their information was required. No such corroboration was sought or obtained in this case, yet we find no fault. To the contrary, we conclude that "the fact that the application for a warrant did not include a specific account of the circumstances under which some informants viewed the events, or whether the two citizens based their reports on personal observations, does not preclude a court from finding probable cause." See ¶ 46. We then proceed to conclude that *Reesman's* "strict rules" cannot be reconciled with the flexibility of the "totality of the circumstances" test that the United States Supreme Court espoused in *Illinois v. Gates.* See ¶ 41.

¶66    In justifying its result, the Court both exaggerates the complexity of *Reesman* and oversimplifies *Gates.* Most importantly, the Court refuses to acknowledge that *Gates*—

like *Reesman*—requires the magistrate to consider, among the totality of the circumstances, the "veracity" and "basis of knowledge" of persons supplying hearsay information. *Gates*, 462 U.S. at 238, 103 S. Ct. at 2332. The Court reaffirmed in *Gates* that "wholly conclusory statements," or statements that an informant "believes" that a crime is being committed, will not do. The Court said that a magistrate's determination of probable cause "cannot be a mere ratification of the bare conclusions of others." *Gates,* 462 U.S. at 239, 103 S. Ct. at 2333. In *Gates*, the police conducted significant independent police work to corroborate the informant's tip. In fact, it was *because* of the independent corroboration provided by the police in *Gates* that the Court concluded that there was a substantial basis for the issuance of the warrant. *Gates,* 462 U.S at 246, 103 S. Ct. at 2336.

¶67 Similarly, in *Rinehart*, we analyzed an application for search warrant that relied in part upon an anonymous Crimestoppers' tip. The Court concluded that the Crimestoppers' tip, by itself, was inadequate to support probable cause without further investigation to corroborate the information, but agreed that it merited consideration under the "totality of the circumstances" test. *Rinehart*, 262 Mont. at 212-13, 864 P.2d at 1223. Notably, the totality of the circumstances in *Rinehart* included information from a reliable, non-anonymous informant who had seen the marijuana operation first-hand, and had described to the police, in great detail, its location and operation. *Rinehart*, 262 Mont. at 212, 864 P.2d at 1224. In essence, the *Rinehart* magistrate used the Crimestopper tip to corroborate the known informant's first-hand information. *Rinehart*, 262 Mont. at 211, 864 P.2d at 1223.

¶68 Here, by contrast, there was no known first-hand informant and no independent police investigation. In fact, there was no independent corroboration of criminal activity at Barnaby's home—from *any* source—police or otherwise. Ignoring this glaring deficiency, we stretch the "flexible" totality of the circumstances test beyond its intended limit, concluding in essence that one "wholly conclusory statement" from an unreliable source (*see Gates, infra*) magically becomes reliable by virtue of its pairing with a similar statement from a second unreliable source. Respectfully, all the discussion in the world cannot disguise the fact that we have taken two unreliable and uncorroborated allegations of criminal doings, added in a report detailing indisputably lawful front-yard activities, and, because of Sheridan's association with the occupant of the home, arrived at a sum finding of probable cause to search Barnaby's home, when in reality the sum is still zero. Without question, the "totality of the circumstances" which we conclude supports the search of Barnaby's home is not nearly as substantial or reliable as were the circumstances in either *Rinehart* or *Gates*.

¶69 The most troubling aspect of the Court's Opinion is its pronouncements regarding *Reesman.* Whereas *Reesman* was once the law, relied upon by district courts and this Court in dozens of rulings and opinions, and by law enforcement in countless analyses, its "neat set of legal rules" no longer apply; now, its guidelines are merely "useful." ¶ 41. I cannot understand why we would choose to abandon a clear guideline against which police officers evaluate the sufficiency of their evidence to justify the issuance of a warrant, in favor of no guidelines at all. We have effectively replaced a level of predictability with one of uncertainty and randomness.

¶70 Montana homes have long enjoyed special protection under our search and seizure jurisprudence. We have said, "The home is the most sanctified of all 'particular places.'" *State v. Graham*, 2004 MT 385, ¶ 22, 325 Mont. 110, ¶ 22, 103 P.3d 1073, ¶ 22. Today, however, we have relaxed the requirements for a search warrant for a man's home, finding that vague uncorroborated accusations, coupled with guilt by association, is enough to justify the issuance of a warrant. And we have in the process undone our carefully analyzed search warrant jurisprudence. In accordance with long-established federal and state case law, Barnaby's motion to suppress should have been granted.

¶71 I therefore dissent from our decision to affirm the District Court's denial of Barnaby's motion to suppress.

/S/ PATRICIA COTTER

Justice James C. Nelson respectfully, but vigorously, dissents.

¶72      *Although the right to be free from unreasonable searches and seizures encompasses more than the home, the home, nonetheless, is historically the* raison d'être *for the constitutional protection. The people's protection against unreasonable search and seizure in their "houses" was drawn from the English common-law maxim "A man's home is* his *castle."* Minnesota v. Carter *(1998), 525 U.S. 83, 94, 119 S.Ct. 469, 142 L.Ed.2d 373 (Scalia, J., concurring) (emphasis in original). "[E]very man's house is looked upon by the law to be his castle." 3 W. Blackstone, Commentaries on the Laws of England 288 (1768). The home is the most sanctified of all "particular places."*

*State v. Graham*, 2004 MT 385, ¶ 22, 325 Mont. 110, ¶ 22, 103 P.3d 1073, ¶ 22.

¶73 The sanctity of the home notwithstanding, this Court today endorses the intrusion into and search of a person's residence by law enforcement based on untimely and wholly unreliable information. Specifically, the three tips that were essential to a finding of probable cause to search Barnaby's residence consist of little more than innuendo and bare suspicions reported by informants of unknown veracity. Nevertheless, the Court accepts these unsubstantiated tips as "reliable reports" and "highly credible evidence" of unlawful activities being conducted at Barnaby's residence. *See* ¶¶ 34, 37, 41, 46. Notably, we are never told why these reports are "reliable" and "highly credible." Perhaps the Court is deferring to the "concerned citizen" and "citizen informant" labels used by the search warrant applicant in reference to the persons who provided the three tips. Yet, the application contains no factual support whatsoever for the applicant's use of these labels. Moreover, the application does not support the conclusion that the unlawful activities alleged by these persons were probably occurring on or about the date of the application. Accordingly, there is no factual basis for presuming, as the Court has done, the reliability and timeliness of these essential tips.

¶74 Its reasoning aside, the Court's Opinion effects, as Justice Cotter points out in her dissenting opinion, an astonishing (and, notably, unsolicited[1]) sea change in the law of search and seizure in Montana. Under the guise of avoiding "mechanical application[s]"

---

[1] The Court's approach vis-à-vis *State v. Reesman*, 2000 MT 243, 301 Mont. 408, 10 P.3d 83, discussed below, is entirely of its own initiative. At no point in its brief does the State even hint that *Reesman* and the precedents collected in that opinion should be overruled. Nor does the State argue that the totality-of-the-circumstances approach as applied in our precedents subsequent to *Reesman* should be modified. To the contrary, the State argues that "the *Reesman* test" was met in this case.

of our case law and a "divide and conquer" approach to evaluating search warrant applications, ¶ 38, the Court not only ignores the broad individual privacy protections afforded Montanans by Article II, Sections 10 and 11, of the Montana Constitution, *see State v. Bullock* (1995), 272 Mont. 361, 383-84, 901 P.2d 61, 75; *State v. Siegal* (1997), 281 Mont. 250, 263, 264, 934 P.2d 176, 183, 184, *overruled in part on other grounds by State v. Kuneff*, 1998 MT 287, ¶ 19, 291 Mont. 474, ¶ 19, 970 P.2d 556, ¶ 19, but also calls into question a multitude of well-established precedents handed down by this Court since the adoption of these constitutional guarantees 34 years ago. Tellingly, the analysis sustaining these actions by the Court is "as thin as the homeopathic soup that was made by boiling the shadow of a pigeon that had been starved to death." Abraham Lincoln, Sixth Debate with Stephen A. Douglas, at Quincy, Illinois (Oct. 13, 1858), in *The Collected Works of Abraham Lincoln* vol. 3, 245, 279 (Roy P. Basler ed., Rutgers University Press 1953).

¶75 Indeed, the Court's approach here seems to be one of emasculating the rules to accommodate the inability of some in law enforcement and the criminal justice system to comply with them. For instance, some have been chafing under our decision in *State v. Reesman*, 2000 MT 243, 301 Mont. 408, 10 P.3d 83, since it was handed down—but no longer. Although the Court claims that its new approach for assessing search warrant applications only "deviates slightly" from *Reesman*, *see* ¶ 41, the simple fact is that *nothing* in the Court's approach to the search warrant application at issue here conforms to—or even resembles—the step-by-step framework we set forth in *Reesman*. *Compare* ¶¶ 31-37 & 46 of the Court's Opinion *with Reesman*, ¶¶ 28-35. Indeed, the Court's

31

contra-*Reesman* approach reflects an outright rejection of that framework, the Court's assurances notwithstanding.

¶76 Likewise, under the Court's Opinion we now accept a search warrant applicant's characterization of an informant as a "concerned citizen" or "citizen informant" at face value, *see* ¶¶ 31, 34, 37, 38, 41, 46. In other words, it no longer is necessary to substantiate such labeling with supporting facts, which is significant given that incriminating information provided by a person who was motivated by good citizenship to report a chance encounter with crime is *presumed* reliable, *see* ¶ 31 of the Court's Opinion; *State v. Valley* (1992), 252 Mont. 489, 493, 830 P.2d 1255, 1258; *State v. Oleson*, 1998 MT 130, ¶ 14, 289 Mont. 139, ¶ 14, 959 P.2d 503, ¶ 14, *overruled in part on other grounds by Kuneff*, ¶ 19. A similarly helpful outcome of today's Opinion is that the Court sanctions the use of a blanket, generalized assertion at the end of a search warrant application concerning the reliability of all of the informants mentioned in the application. In the future, all an applicant need do is assure the reviewing magistrate: "The informants mentioned in this application have given reliable information in the past. All have been proven reliable with corroborating information that resulted in arrests from the information they provided. All of the above informants are separate and apart from each other, and are not aware of the others' participation." The tedious task of specifying the particulars supporting such an assurance is no longer required. To be sure, the Court "admonish[es]" police officers to corroborate independently information from sources of "questionable reliability," ¶ 42; yet, the Court's resolution of the case at hand makes it clear that in reality, no consequences flow from an officer's failure to do so.

¶77 While I am not indifferent to the challenges faced by officers engaged in "the often competitive enterprise of ferreting out crime," *Johnson v. United States* (1948), 333 U.S. 10, 14, 68 S.Ct. 367, 369, the simple fact is that we may not vitiate constitutional guarantees simply because they burden evidence gathering practices. *See Davis v. Washington* (2006), ___ U.S. ___, ___, 126 S.Ct. 2266, 2280 ("We may not . . . vitiate constitutional guarantees when they have the effect of allowing the guilty to go free."); *Mapp v. Ohio* (1961), 367 U.S. 643, 648, 81 S.Ct. 1684, 1688 (" 'The efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land.' " (quoting *Weeks v. United States* (1914), 232 U.S. 383, 393, 34 S.Ct. 341, 344)). As a matter of fact, it is precisely to restrain the State's ability to enter our homes that the constitutional protections against unreasonable searches and seizures exist in the first place. As Justice Kennedy recently observed in an analogous context,

> privacy and security in the home are central to the Fourth Amendment's guarantees as explained in our decisions and as understood since the beginnings of the Republic. This common understanding ensures respect for the law and allegiance to our institutions, and it is an instrument for transmitting our Constitution to later generations undiminished in meaning and force. It bears repeating that it is a serious matter if law enforcement officers violate the sanctity of the home by ignoring the requisites of lawful entry. Security must not be subject to erosion by indifference or contempt.

*Hudson v. Michigan* (2006), ___ U.S. ___, ___, 126 S.Ct. 2159, 2170 (Kennedy, J., concurring in part and concurring in the judgment).

¶78 Notwithstanding this admonition, the Court today substantially weakens our citizens' privacy and security in their homes by virtue of the remarkable and extensive transformation in Montana search and seizure law effected by this decision. No longer may we proclaim that Article II, Sections 10 and 11, of the Montana Constitution provide *greater* protections of individual privacy than are provided by the federal constitution. Rather, the determination of probable cause to issue a search warrant is now completely dependent on the whim of whatever trial and appellate judges happen to be reviewing the application.

¶79 While I agree with Justice Cotter's well-reasoned and well-written dissenting opinion, I write separately to underscore the cursory nature of the Court's analysis and the alarming implications of its disposition of Barnaby's unlawful search claim. Reduced to its essentials, so long as a search warrant application is buoyed by the usual mantra of general platitudes, pretty much anything will hereafter suffice to issue the warrant—stale information, hearsay, informant suspicion, innuendo, guilt by association, and sloppy police work, in complete disregard of this Court's long-established precedents and proper judicial oversight. This case has it all—and, unfortunately, little else. It is therefore instructive to carefully walk through each of the assertions set forth in the application at issue. Before doing so, however, it is necessary to review fully the law applicable to the assessment of search warrant applications.

I.      The Law of Assessing Search Warrant Applications

    A.      Probable Cause

¶80 The Fourth Amendment to the United States Constitution provides that "no Warrants shall issue, but upon *probable cause*, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV (emphasis added). Similarly, Article II, Section 11, of the Montana Constitution provides that "[n]o warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, or without *probable cause*, supported by oath or affirmation reduced to writing." Mont. Const. art. II, § 11 (emphasis added).

¶81 The "probable cause" standard seeks both "to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime" and "to give fair leeway for enforcing the law in the community's protection." *Brinegar v. United States* (1949), 338 U.S. 160, 176, 69 S.Ct. 1302, 1311.

> Probable cause, defining the point at which the individual's interest in privacy must yield to the governmental interest in investigating criminal behavior by searching for incriminating items, is a practical, nontechnical concept of criminal procedure, in effect amounting to the best compromise that has been found for accommodating often opposing interests, on the one hand the interest of the citizen to be protected from unreasonable intrusions on his privacy and security, and on the other the interest of the community to be adequately protected by efficient law enforcement.

*State v. Sundberg* (1988), 235 Mont. 115, 119, 765 P.2d 736, 739 (citing *Brinegar*, 338 U.S. at 176, 69 S.Ct. at 1311).

¶82 As the Supreme Court has observed, however, "[t]he probable-cause standard is incapable of precise definition or quantification into percentages." *Maryland v. Pringle* (2003), 540 U.S. 366, 371, 124 S.Ct. 795, 800. This is because " '[i]n dealing with

35

probable cause . . . , as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *State v. Rinehart* (1993), 262 Mont. 204, 210, 864 P.2d 1219, 1222 (quoting *Brinegar*, 338 U.S. at 175, 69 S.Ct. at 1310). In other words, "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates* (1983), 462 U.S. 213, 232, 103 S.Ct. 2317, 2329.

¶83 Notwithstanding the "fluid" nature of the concept, the Supreme Court has observed that " '[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt,' " *Pringle*, 540 U.S. at 371, 124 S.Ct. at 800 (alteration in original) (quoting *Brinegar*, 338 U.S. at 175, 69 S.Ct. at 1310), which means "less than evidence which would justify condemnation or conviction," but "more than bare suspicion." *Brinegar*, 338 U.S. at 175, 69 S.Ct. at 1310 (internal quotation marks omitted); *see also State v. Bennett* (1972), 158 Mont. 496, 499, 493 P.2d 1077, 1078 (same); *Gates*, 462 U.S. at 235, 103 S.Ct. at 2330 ("only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause") (internal quotation marks omitted). Thus, probable cause exists where the facts and circumstances within the reviewing judicial officer's knowledge and of which he or she has reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution in the belief that an offense has been or is being committed and evidence thereof will be found in the suspected place. *Brinegar*, 338 U.S. at 175-76, 69 S.Ct. at 1311; *see also State v. Kuneff*, 1998 MT 287, ¶ 22, 291 Mont. 474, ¶ 22, 970 P.2d 556, ¶ 22

("Probable cause exists when the facts and circumstances presented would warrant an honest belief in the mind of a reasonable and prudent man that the offense has been, or is being, committed and that the property sought exists at the place designated." (internal quotation marks omitted)).

¶84    Importantly, the determination of probable cause in this context is to be made by a "neutral and detached" judicial officer. *Gates*, 462 U.S. at 240, 103 S.Ct. at 2333. As the Court explained in *Johnson v. United States* (1948), 333 U.S. 10, 68 S.Ct. 367:

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.

*Johnson*, 333 U.S. at 13-14, 68 S.Ct. at 369 (footnotes omitted).

### B.    The Totality-of-the-Circumstances Approach

¶85    Because the probable cause standard is a "practical, nontechnical conception," *Gates*, 462 U.S. at 231, 103 S.Ct. at 2328 (internal quotation marks omitted), the Supreme Court in *Gates* abandoned the "rigid" two-pronged test that had evolved from its decisions in *Aguilar v. Texas* (1964), 378 U.S. 108, 84 S.Ct. 1509, and *Spinelli v.*

*United States* (1969), 393 U.S. 410, 89 S.Ct. 584. *Gates*, 462 U.S. at 229 n.4, 231, 238, 103 S.Ct. at 2327 n.4, 2328, 2332. In its place, the Court "reaffirm[ed]" the "totality-of-the-circumstances approach" for determining—under the Fourth Amendment—whether there is probable cause to believe that contraband or evidence is located in a particular place. *Gates*, 462 U.S. at 230-31, 238, 103 S.Ct. at 2328, 2332. Under this approach,

> [t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed.

*Gates*, 462 U.S. at 238-39, 103 S.Ct. at 2332 (ellipsis and second alteration in original). The Court reasoned that "this flexible, easily applied standard will better achieve the accommodation of public and private interests that the Fourth Amendment requires" than does a "rigid demand that specific 'tests' be satisfied by every informant's tip." *Gates*, 462 U.S. at 231, 239, 103 S.Ct. at 2328, 2332.

¶86 Following the federal lead, this Court also rejected "the 'labyrinthine body of judicial refinement' built over the 'prongs' and 'spurs' of the *Aguilar-Spinelli* tests," *State v. Kelly* (1983), 205 Mont. 417, 438, 668 P.2d 1032, 1044, in favor of the totality-of-the-circumstances approach for determining whether, under Montana law,[2] probable

---

[2] Search analysis in Montana is typically conducted under Article II, Sections 10 and 11, of the Montana Constitution, in addition to the Fourth Amendment to the United States Constitution. *State v. Tackitt*, 2003 MT 81, ¶ 17, 315 Mont. 59, ¶ 17, 67 P.3d 295, ¶ 17 (citing *State v. Scheetz* (1997), 286 Mont. 41, 45, 950 P.2d 722, 724); *State v. Siegal* (1997), 281 Mont. 250, 264-65, 934 P.2d 176, 184, *overruled in part on other grounds by State v. Kuneff*, 1998 MT 287, ¶ 19, 291 Mont. 474, ¶ 19, 970 P.2d 556, ¶ 19.

cause exists for the issuance of a search warrant, *see Kelly*, 205 Mont. at 440, 668 P.2d at 1045; *State v. Jensen* (1985), 217 Mont. 272, 276, 704 P.2d 45, 47.

¶87    Unique to our analysis under this approach, however, is the fact that "Montana has a strong tradition of respect for the right to individual privacy." *State v. Bullock* (1995), 272 Mont. 361, 383, 901 P.2d 61, 75.  Indeed, our Constitution, unlike its federal counterpart, explicitly ensures Montanans the right to privacy.  Specifically, Article II, Section 10, states that "[t]he right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest."  This unique constitutional language affords Montanans a greater right to privacy and, therefore, broader protection than does the Fourth Amendment in cases involving searches of, or seizures from, private property.  *Bullock*, 272 Mont. at 384, 901 P.2d at 75; *see also State v. Sawyer* (1977), 174 Mont. 512, 515, 571 P.2d 1131, 1133, *overruled in part on other grounds by State v. Long* (1985), 216 Mont. 65, 67, 71, 700 P.2d 153, 155, 157.

¶88    Accordingly, we do not "march lock-step" with the Supreme Court's applications of the totality-of-the-circumstances approach.  *See State v. Johnson* (1986), 221 Mont. 503, 512, 719 P.2d 1248, 1254, *overruled in part on other grounds by State v. Buck*, 2006 MT 81, ¶ 48, 331 Mont. 517, ¶ 48, 134 P.3d 53, ¶ 48; *Bullock*, 272 Mont. at 384, 901 P.2d at 75.  Rather, application of that approach in Montana necessarily involves a more rigorous standard for reviewing an application for search warrant.  Although we have not explicitly defined this standard (relative to the federal standard), it is clear from the principles set forth above that the totality-of-the-circumstances approach under Article II,

Sections 10 and 11, incorporates a greater deference to individual privacy interests than does its counterpart under the Fourth Amendment.

¶89    This greater deference, in turn, influences the balancing of interests that the probable cause concept represents.  As explained above, "probable cause" reflects a compromise between two concededly important, yet often opposing, interests:  the individual's interest in privacy and the community's interest in the investigation of crime by law enforcement.  The point at which the former must yield to the latter is the crucial distinction between assessing the totality-of-the-circumstances under Article II, Sections 10 and 11, versus the Fourth Amendment.  Under the Fourth Amendment, that point is reached where there is a "fair probability," based on all of the circumstances set forth in the application, that contraband or evidence of a crime will be found in the place to be searched.  *Gates*, 462 U.S. at 238, 103 S.Ct. at 2332.

¶90    In adopting the *Gates* formulation of the totality-of-the-circumstances approach, we also adopted *Gates*'s "fair probability" standard, *see State v. O'Neill* (1984), 208 Mont. 386, 394-95, 679 P.2d 760, 764-65; *State v. Pierre* (1984), 208 Mont. 430, 435, 678 P.2d 650, 653, and we have continued to cite this standard in our totality-of-the-circumstances analyses, *see State v. Walston* (1989), 236 Mont. 218, 221, 768 P.2d 1387, 1389; *State v. Sarbaum* (1995), 270 Mont. 176, 184-85, 890 P.2d 1284, 1289-90; *State v. Kaluza* (1995), 272 Mont. 404, 411, 901 P.2d 107, 112; *State v. Marks*, 2002 MT 255, ¶¶ 17, 19, 312 Mont. 169, ¶¶ 17, 19, 59 P.3d 369, ¶¶ 17, 19; *State v. Meyer*, 2004 MT 272, ¶ 23, 323 Mont. 173, ¶ 23, 99 P.3d 185, ¶ 23.  However, given that Article II, Section 10, provides for a broader right to privacy than does the Fourth Amendment, a

heightened level of persuasion is implicit in our applications of the "fair probability" standard. In other words, before the fundamental right of individual privacy[3] will give way to the interest in investigation of criminal activity, the factual assertions set forth in the warrant application must be more stringently buttressed (in the manner explained below in Part I-C) than the Fourth Amendment requires, such that the reviewing judicial officer has a concrete and independent sense that contraband or evidence of a crime will be found in the place to be searched.

### C. The Role of Veracity, Reliability, Basis of Knowledge, and Independent Corroboration in the Totality-of-the-Circumstances Approach

¶91 Significantly, the "two-pronged test" set forth in *Aguilar v. Texas*, *supra*, and later refined in *Spinelli v. United States*, *supra*, was originally "intended simply as guides to a magistrate's determination of probable cause, not as inflexible, independent requirements applicable in every case." *Gates*, 462 U.S. at 230 n.6, 103 S.Ct. at 2328 n.6. As the Court explained,

> [i]n *Aguilar*, we required only that:
>
> > "the magistrate must be informed of *some of the underlying circumstances* from which the informant concluded that . . . narcotics were where he claimed they were, and *some of the underlying circumstances* from which the officer concluded that the informant . . . was 'credible' or his information 'reliable.' "
>
> As our language indicates, we intended neither a rigid compartmentalization of the inquiries into an informant's "veracity," "reliability," and "basis of knowledge," nor that these inquiries be elaborate

---

[3] The right of individual privacy is a "fundamental" right. *Gryczan v. State* (1997), 283 Mont. 433, 449, 942 P.2d 112, 122; *State v. Pastos* (1994), 269 Mont. 43, 47, 887 P.2d 199, 202.

exegeses of an informant's tip. Rather, we required only that *some* facts bearing on two particular issues be provided to the magistrate.

*Gates*, 462 U.S. at 230 n.6, 103 S.Ct. at 2328 n.6 (ellipses in original, citation omitted).

This requirement still exists under the totality-of-the-circumstances approach as defined in *Gates*.

¶92    Indeed, although the Supreme Court rejected *Aguilar-Spinelli*'s "two-pronged test," it did not reject the requirement set forth in those cases that a judicial officer, in assessing an application for a search warrant, be able to evaluate (from the information provided in the application) an informant's veracity, reliability, and basis of knowledge. *Gates*, 462 U.S. at 238-39, 103 S.Ct. at 2332-33. To the contrary, the Court stated that "an informant's 'veracity,' 'reliability,' and 'basis of knowledge' are all highly relevant in determining the value of his report." *Gates*, 462 U.S. at 230, 103 S.Ct. at 2328. Accordingly, the totality-of-the-circumstances approach itself incorporates this requirement:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, *including the "veracity" and "basis of knowledge" of persons supplying hearsay information*, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Gates*, 462 U.S. at 238, 103 S.Ct. at 2332 (emphasis added); *see also State v. Adams* (1997), 284 Mont. 25, 35-36, 943 P.2d 955, 961 ("In determining probable cause under the totality of the circumstances test, the veracity, reliability and basis of knowledge of an informant remain highly relevant factors."); *State v. Rinehart* (1993), 262 Mont. 204, 210, 864 P.2d 1219, 1222 ("The veracity, reliability and basis of knowledge of

informants remain highly relevant factors in determining probable cause under the totality of the circumstances test."); *State v. Crowder* (1991), 248 Mont. 169, 173, 810 P.2d 299, 302 ("Ascertaining the veracity and bases of informants' knowledge are important aspects of the 'totality of the circumstances' test."); *State v. Seaman* (1989), 236 Mont. 466, 472, 771 P.2d 950, 953 ("Under the totality of the circumstances test, the veracity, reliability, and basis of knowledge of informants remains highly relevant to determining probable cause from the reports of such informants.").[4]

¶93  Thus, an informant's "veracity" or "reliability" and his "basis of knowledge" no longer have "independent status"; rather, "a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Gates*, 462 U.S. at 233, 103 S.Ct. at 2329.

> If, for example, a particular informant is known for the unusual reliability of his predictions of certain types of criminal activities in a locality, his failure, in a particular case, to thoroughly set forth the basis of his knowledge surely should not serve as an *absolute bar* to a finding of probable cause based on his tip. Likewise, if an unquestionably honest citizen comes forward with a report of criminal activity—which if fabricated would subject him to criminal liability—we have found rigorous scrutiny of the basis of his knowledge unnecessary. Conversely, even if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to *greater weight* than might otherwise be the case.

---

[4] The Court recites the totality-of-the-circumstances approach as set forth in *Gates* almost verbatim. *See* ¶ 29. Conspicuously absent from its recitation (indeed, from the entire Opinion), however, is the emphasized portion of the foregoing passage from *Gates*—i.e., the requirement that the issuing magistrate consider "the 'veracity' and 'basis of knowledge' of persons supplying hearsay information." This omission by the Court is consistent with its new diluted version of the totality-of-the-circumstances approach, which apparently cannot be burdened with a requirement that the search warrant applicant actually substantiate the reliability of his informants and their information.

*Gates*, 462 U.S. at 233-34, 103 S.Ct. at 2329-30 (emphases added, citations and footnote omitted).

¶94 Furthermore, in addition to the informant's veracity and basis of knowledge, the reliability of his information may be demonstrated through independent corroboration. Indeed, the Court noted that its decisions applying the totality-of-the-circumstances approach "have consistently recognized the value of corroboration of details of an informant's tip by independent police work." *Gates*, 462 U.S. at 241, 103 S.Ct. at 2334. Independent corroboration may even resurrect a tip that otherwise could not be afforded any weight in the totality-of-the-circumstances analysis. *See Gates*, 462 U.S. at 242-43 & n.12, 103 S.Ct. at 2334 & n.12 (discussing the corroborative efforts of police officers in *Draper v. United States* (1959), 358 U.S. 307, 79 S.Ct. 329). Thus, while the anonymous letter sent to the police department in *Gates*[5] was, standing alone,

_____

[5] On May 3, 1978, the Bloomingdale, Illinois, Police Department received by mail an anonymous handwritten letter which read as follows:

> This letter is to inform you that you have a couple in your town who strictly make their living on selling drugs. They are Sue and Lance Gates, they live on Greenway, off Bloomingdale Rd. in the condominiums. Most of their buys are done in Florida. Sue his wife drives their car to Florida, where she leaves it to be loaded up with drugs, then Lance flys down and drives it back. Sue flys back after she drops the car off in Florida. May 3 she is driving down there again and Lance will be flying down in a few days to drive it back. At the time Lance drives the car back he has the trunk loaded with over $100,000.00 in drugs. Presently they have over $100,000.00 worth of drugs in their basement.
>
> They brag about the fact they never have to work, and make their entire living on pushers.
>
> I guarantee if you watch them carefully you will make a big catch. They are friends with some big drugs dealers, who visit their house often.
>
> Lance & Susan Gates
>
> Greenway

insufficient to establish probable cause to believe that contraband would be found in the Gateses' car and home, *Gates*, 462 U.S. at 227, 103 S.Ct. at 2326, the independent investigation conducted by the police—which itself suggested that the Gateses were involved in drug trafficking, *Gates*, 462 U.S. at 243, 103 S.Ct. at 2335—enabled the reviewing judge to rely on the letter in making the probable cause determination, *Gates*, 462 U.S. at 243-44, 103 S.Ct. at 2335.

¶95    In sum, what the Supreme Court modified in *Gates* was not the requirement that an informant's tip be accompanied by some indicia of reliability (e.g., facts bearing on the informant's veracity and basis of knowledge, and/or details of independent investigative or corroborative efforts); rather, it was the *manner* in which a magistrate assesses that tip.  No longer does the magistrate conduct "an excessively technical dissection of informants' tips, with undue attention . . . focused on isolated issues that cannot sensibly be divorced from the other facts presented."  *Gates*, 462 U.S. at 234-35, 103 S.Ct. at 2330 (footnote omitted).  Instead, the magistrate carries out "a balanced assessment of the relative weights of *all* the various indicia of reliability (and unreliability) attending an informant's tip."  *Gates*, 462 U.S. at 234, 103 S.Ct. at 2330 (emphasis added).

¶96    This distinction—one which we previously recognized in *Adams*, *Rinehart*, *Crowder*, and *Seaman*, but which has eluded the Court in this case—is crucial to a proper understanding of the totality-of-the-circumstances approach.

---

in Condominiums
*Gates*, 462 U.S. at 225, 103 S.Ct. at 2325 (internal quotation marks omitted).

> [P]robable cause can[not] be made out by affidavits which are purely conclusory, stating only the affiant's or an informer's belief that probable cause exists without detailing any of the "underlying circumstances" upon which that belief is based. Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police.

*United States v. Ventresca* (1965), 380 U.S. 102, 108-09, 85 S.Ct. 741, 746 (citation omitted); *see also State v. Olson* (1979), 180 Mont. 151, 154, 589 P.2d 663, 665 ("[T]he magistrate must base his finding upon *competent evidence* sufficient to enable the magistrate to form *his own independent conclusion*." (first emphasis in original, second emphasis added)). Thus, it is not sufficient that the information set forth in a warrant application would, *if taken as true*, establish probable cause. Nor is it sufficient that the application contains a number of similar or identical assertions by multiple informants whose reliability is unknown. *See State v. Valley* (1992), 252 Mont. 489, 493, 830 P.2d 1255, 1258 ("In determining probability, it is not the number of statements, tips or events that is determinative relative to the common sense approach, it is the probative force of one, some or all of them. Insufficient data to establish probable cause is not strengthened by number or repetition.").

¶97 To the contrary, the search warrant applicant must demonstrate—within the "four corners" of the application, *State v. Reesman*, 2000 MT 243, ¶ 24, 301 Mont. 408, ¶ 24, 10 P.3d 83, ¶ 24; *State v. Isom* (1982), 196 Mont. 330, 341, 641 P.2d 417, 423—that the information contained therein is "reasonably trustworthy," *Brinegar*, 338 U.S. at 175, 69 S.Ct. at 1311 (internal quotation marks omitted). In other words, he must set forth facts from which the reviewing judicial officer can assess the reliability of the various

assertions in the application, mindful of the heightened level of persuasion required by Article II, Sections 10 and 11. *See State v. Griffin*, 2004 MT 331, ¶ 23, 324 Mont. 143, ¶ 23, 102 P.3d 1206, ¶ 23 (" 'A mere affirmance of belief or suspicion by a police officer, absent any underlying facts or circumstances, does not establish probable cause for the issuance of a search warrant.' " (quoting *State v. Lott* (1995), 272 Mont. 195, 199, 900 P.2d 306, 309, in turn quoting *Isom*, 196 Mont. at 343, 641 P.2d at 424)). The judicial officer should not be left to guess as to why the applicant considers a person cited in the application and her information to be reliable. There must be facts bearing on the veracity and/or basis of knowledge of this person, or details of any steps taken by the applicant to corroborate her information. Otherwise, the judicial officer is unable to credit her tip; at best, her information is of little weight in the overall probable cause assessment.

### D. *Reesman* and Establishing the Reliability of Informants' Information

¶98 To a large extent, probable cause determinations are subjective—as epitomized by the approach utilized by the Court in this case. Hence, consistent with the Supreme Court's purpose in *Aguilar*, this Court over the years has adopted a variety of rules to guide probable cause determinations and the assessment of the reliability of information provided by informants—mindful of the requirement that a more persuasive quantum of facts must be provided to the reviewing judicial officer under the heightened totality-of-the-circumstances standard mandated by Article II, Sections 10 and 11. Six years ago, noting that this case law had "as a whole create[d] an appearance of convolution," *Reesman*, ¶ 26, we pulled together in one place extant precedent and unambiguously

articulated a step-by-step process for assessing under the totality-of-the-circumstances approach the probative value of different types of information set forth in search warrant applications, *see Reesman*, ¶¶ 24-48.

¶99    Importantly, *Reesman* did not establish any new law.  Nor did it impose any new obligations on police, prosecutors, or judges.   Rather, the opinion merely collected the rules that this Court had adopted in numerous search and seizure cases and presented them in what might be described as "cookbook fashion."  For this reason, the majority's mere lip service to the *Reesman* framework implicates not only that one decision, but also the extensive jurisprudence developed before (and after) *Reesman*.

¶100   Furthermore, nothing in *Reesman* signifies a return to the days of inflexible multi-pronged tests or "strict rules," notwithstanding the Court's inability to "easily reconcile" *Reesman* with the totality-of-the-circumstances approach, ¶ 41.   To the contrary, we specifically acknowledged that "[the] 'totality of the circumstances approach' by design resists 'any rigid demand that *specific tests* be satisfied by every informant's tip.' " *Reesman*, ¶ 27.   At the same time, however, we observed that, "based on 17 years of precedent laid down by this Court since we adopted the *Gates* test . . . , certain indelible threshold rules have emerged.  In turn, these rules may be merged into a fairly coherent step-by-step analysis for determining whether an informant's information is sufficient to establish probable cause." *Reesman*, ¶ 27.

¶101   Accordingly, *Reesman* represents both a reaffirmation of the totality-of-the-circumstances approach—an approach every Member of this Court presently agrees is the proper method for assessing whether probable cause exists to issue a search warrant—and

our recognition that sufficient facts bearing on an informant's veracity and basis of knowledge must be provided to the reviewing judicial officer so that he or she is able to make a conscientious and informed probable cause determination under the heightened standard required by Article II, Sections 10 and 11. To this end, we synthesized from our case law the following principles.

¶102   1. If the informant is anonymous, then independent corroboration of his or her information is required. *Reesman*, ¶ 28 & n.1 (citing *State v. Rinehart* (1993), 262 Mont. 204, 211-12, 864 P.2d 1219, 1223-24; *State v. Valley* (1992), 252 Mont. 489, 493, 830 P.2d 1255, 1257; *State v. Worrall*, 1999 MT 55, ¶ 22, 293 Mont. 439, ¶ 22, 976 P.2d 968, ¶ 22; *State v. Adams* (1997), 284 Mont. 25, 37, 943 P.2d 955, 962). This is not to say that a warrant application necessarily fails to establish probable cause if it contains uncorroborated information provided by an anonymous informant. Rather, it is, in essence, a statement of the obvious: such information is entitled to little, if any, weight in the probable cause determination, since a reviewing judicial officer cannot make "a conscientious assessment of the basis for crediting such [a tip]," *Gates*, 462 U.S. at 238, 103 S.Ct. at 2332, when no indicia of reliability whatsoever attend it.

¶103   Indeed, the Supreme Court had this to say about the anonymous letter sent to the police department in *Gates*:

> The Illinois Supreme Court concluded—and we are inclined to agree—that, standing alone, the anonymous letter . . . would not provide the basis for a magistrate's determination that there was probable cause to believe contraband would be found in the Gateses' car and home. The letter provides virtually nothing from which one might conclude that its author is either honest or his information reliable; likewise, the letter gives absolutely no indication of the basis for the writer's predictions regarding

> the Gateses' criminal activities. Something more was required, then, before a magistrate could conclude that there was probable cause to believe that contraband would be found in the Gateses' home and car.

*Gates*, 462 U.S. at 227, 103 S.Ct. at 2326. As discussed earlier, the Court ultimately concluded that because of the investigating detective's efforts in corroborating the details set forth in the letter, the magistrate could reasonably rely on the letter in the probable cause determination. *See Gates*, 462 U.S. at 243-45, 246, 103 S.Ct. at 2335-36. The Court explained that while the honesty and reliability of the anonymous informant were indeed unknown to the police at the time they received the letter, this fact "became far less significant after [the detective's] independent investigative work occurred." *Gates*, 462 U.S. at 244, 103 S.Ct. at 2335.

¶104   2. If the informant is not anonymous, is his or her information based on his or her personal observation of the described criminal activity (as opposed to hearsay)? If not, then independent corroboration of the informant's information is required. *Reesman*, ¶¶ 29-30 (citing *Rinehart*, 262 Mont. at 212, 864 P.2d at 1224; *State v. Kaluza* (1995), 272 Mont. 404, 411, 901 P.2d 107, 111; *State v. Wilson* (1992), 254 Mont. 317, 319, 837 P.2d 1346, 1347). Again, nothing about this second inquiry is novel or "impractical." It is merely another statement of the obvious: there is little or no basis for crediting hearsay provided by a non-anonymous informant when no other indicia of reliability—such as the informant's veracity or the officer's independent corroboration—attend the tip. But if the informant's veracity is established in the application (e.g., through independent corroboration or prior dealings), then his or her information may be credited. *See*, *e.g.*, *Gates*, 462 U.S. at 233, 103 S.Ct. at 2329-30 ("If, for example, a particular informant is

known for the unusual reliability of his predictions of certain types of criminal activities in a locality, his failure, in a particular case, to thoroughly set forth the basis of his knowledge surely should not serve as an absolute bar to a finding of probable cause based on his tip.").

¶105   3. If the informant is not anonymous and if his or her information was gleaned from personal observations, is he or she a reliable source of such information?  If not, then independent corroboration of the informant's information is required.  *Reesman*, ¶¶ 31-35 (citing *Kaluza*, 272 Mont. at 410, 901 P.2d at 111; *Rinehart*, 262 Mont. at 212, 864 P.2d at 1223-24; *State v. Walston* (1989), 236 Mont. 218, 223, 768 P.2d 1387, 1390; *Adams*, 284 Mont. at 37, 943 P.2d at 962; *State v. Sundberg* (1988), 235 Mont. 115, 121, 765 P.2d 736, 740; *Valley*, 252 Mont. at 493, 830 P.2d at 1258; *Worrall*, ¶¶ 20-21; *State v. Oleson*, 1998 MT 130, ¶ 14, 289 Mont. 139, ¶ 14, 959 P.2d 503, ¶ 14).

¶106   As part of this third inquiry, we identified three scenarios in which independent corroboration is *not* required (i.e., the informant is, essentially, presumed to be a reliable source of information):  (a) where the informant is a "confidential informant" who has "provided reliable and accurate information to officers in the past," *Reesman*, ¶ 32; (b) where "the informant makes an unequivocal admission against interest," *Reesman*, ¶ 33; and (c) where "the informant was motivated by 'good citizenship' and the information provided demonstrates a sufficient degree of the nature of the circumstances under which the incriminating information became known," *Reesman*, ¶ 34.  (Obviously, there is no basis for treating a person as one of these three types of informants when no supporting facts are set forth in the application.  Nevertheless, the Court blindly accepts

such labeling in the case at hand, *see* ¶¶ 31, 32, 34, 37, 38, 41, 46, thereby signaling that we now accept the labels "concerned citizen" and "citizen informant" without question.)

¶107   However, in stating that independent corroboration is required for information that does not fall within one of these three categories, *see Reesman*, ¶ 35, we did not mean that other indicia of reliability could not compensate for the deficiency in the informant's reliability.  Rather, we were simply acknowledging that personal observations relayed to an officer by a non-anonymous informant of unknown reliability are entitled to relatively less weight when no other indicia of reliability—such as independent corroboration— attend the tip.  *See*, *e.g.*, *Gates*, 462 U.S. at 234, 103 S.Ct. at 2330 ("[E]ven if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case.").

¶108   Thus, *Reesman* did *not* create a rigid, multi-pronged test or "strict rules," the Court's Opinion notwithstanding.  To the contrary, the decision is, as described above, essentially a cookbook, indicating to law enforcement whether a given informant's information is sufficient, without independent corroboration or investigation, to establish probable cause.  *See Reesman*, ¶ 27.  If the informant is anonymous, little—if any— weight can be given his or her tip absent independent corroboration.  The same is true of non-anonymous informants whose veracity or basis of knowledge are not established in the warrant application.   This conclusion is mandated not only under the minimal standard set forth by the Fourth Amendment, *see Gates*, 462 U.S. at 227, 103 S.Ct. at

2326, but also by the higher standard mandated by Article II, Section 10, *see Bullock*, 272 Mont. at 383-84, 901 P.2d at 75.

¶109 To be sure, a finding that an informant lacks veracity or that his or her basis of knowledge is unknown or wanting is not fatal to establishing probable cause, since other indicia of reliability (whether related to the particular informant or to the application as a whole) may supply the necessary basis for a finding of probable cause. *Gates*, 462 U.S. at 233, 103 S.Ct. at 2329. But at a minimum, "[s]ufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." *Gates*, 462 U.S. at 239, 103 S.Ct. at 2333; *see also State v. Olson* (1979), 180 Mont. 151, 154, 589 P.2d 663, 665 ("[T]he magistrate must base his finding upon *competent evidence* sufficient to enable the magistrate to form *his own independent conclusion*.") (first emphasis in original, second emphasis added).

¶110 With that, I now turn to the actual search warrant application.

## II. Analysis of the Search Warrant Application at Issue

### A. Background

¶111 On February 11, 2002, Flathead Tribal Police Narcotics Investigator Louis J. Fiddler ("Fiddler") presented District Judge McNeil with a sworn Application for Search Warrant to search "the residence, outbuildings, and numerous junk vehicles" located on property owned by Barnaby. Fiddler alleged that evidence of the crimes of criminal possession of dangerous drugs and criminal production or manufacture of dangerous drugs would be found at this location.

53

¶112 In support of his application, Fiddler set forth fourteen factual assertions, all but three of which regarded the activities of June Malatare-Sheridan ("Sheridan"). Based on these assertions, Judge McNeil concluded that "there is probable cause to believe that evidence of a crime is located in the residence, outbuildings, and numerous junk vehicles" on Barnaby's property. Accordingly, on February 11, 2002, he issued a warrant "to search said premises [and Sheridan's car]," which Fiddler executed on February 13, 2002. Thereafter, Barnaby and Sheridan were both charged with operation of an unlawful clandestine laboratory, in violation of § 45-9-132(1), MCA.

¶113 On May 23, 2003, Sheridan filed a motion, in which Barnaby later joined, to suppress the evidence seized by Fiddler on the ground that Fiddler's application "fail[ed] to establish probable cause for the issuance of the search warrant in this case." Addressing each assertion set forth in the application in turn, Sheridan noted that the first few assertions were "not relevant" to the search of Barnaby's home and that most of the remaining assertions were, in substance, "mere conclusory statements lacking factual support." For instance, with respect to the tips provided by informants who Fiddler labeled as "concerned citizen[s]," Sheridan pointed out that while a concerned citizen is presumed reliable, such reliability "is generally shown by the very nature of the circumstances under which the incriminating information became known" (citing *State v. Siegal* (1997), 281 Mont. 250, 281, 934 P.2d 176, 194); yet, Fiddler's application "states absolutely no circumstances or facts as to how the 'incriminating information' became known by the citizen informant[s]." Similarly, she observed that information provided by several other informants referenced in the application was "sheer speculation" and that

54

there was "no factual basis" for crediting this information. Lastly, having recognized that one of the tips "tends to show some propensity for criminal activity on the part of Sheridan," she reminded the court that "[p]robable cause must exist for the search of the **particular location** for which the search warrant is obtained. Pursuant to [*State v. Kaluza* (1995), 272 Mont. 404, 901 P.2d 107], probable cause to believe that an offense has been committed by a suspect is a separate question from whether probable cause exists to search a particular residence." In conclusion, she argued that the conclusory and speculative statements, taken together with the other information in the application, "did not establish the existence of a fair probability that evidence related to a crime would be found at the 'Barnaby residence.' "

¶114   The State, in response, maintained that "the reliability of each of the informants is established." First, the State argued that by virtue of Fiddler's assertion (near the end of his application) that each of the informants named in the application has given reliable information in the past, "[n]o further corroboration [was] necessary." Second, the State cited the presumption of reliability accorded information provided by "concerned citizens." Third, with respect to the two informants who had reported that Sheridan was manufacturing methamphetamine at Barnaby's residence, the State—conceding that "the source of their information is not known"—suggested that their information was corroborated by a third informant who reported "unusual activity" at Barnaby's residence. Lastly, the State asserted that "[p]olice surveillance indicated that . . . [Sheridan's] car was located [at Barnaby's residence]," though no such police surveillance is referenced within the four corners of Fiddler's application.

¶115 Following a hearing on September 12, 2003, District Judge Christopher denied Sheridan and Barnaby's motion to suppress.

### B. The Individual Factual Assertions in Fiddler's Application

¶116 The inadequacy of Fiddler's search warrant application is camouflaged by the numerosity of provocative, yet unsupported assertions set forth therein, as though insufficient data is strengthened by number and repetition. In order to properly analyze the totality of his application, it is necessary first to assess the probative value of the individual pieces of information. In this regard, we have occasionally said that in analyzing an application for search warrant, we do not look at each individual fact presented in the application, but rather at the totality of the circumstances. *See*, *e.g.*, *State v. Morse*, 2006 MT 54, ¶ 12, 331 Mont. 300, ¶ 12, 132 P.3d 528, ¶ 12; *State v. Beaupre*, 2004 MT 300, ¶ 37, 323 Mont. 413, ¶ 37, 102 P.3d 504, ¶ 37; *State v. Bowman*, 2004 MT 119, ¶ 29, 321 Mont. 176, ¶ 29, 89 P.3d 986, ¶ 29. This is a slight misstatement of our approach. In *State v. St. Marks*, 2002 MT 285, 312 Mont. 468, 59 P.3d 1113, to which *Morse* (indirectly), *Beaupre* (directly), and *Bowman* (directly) cite, we explained that "[w]hen assessing a search warrant application, '[t]he test is not to determine whether each individual fact presented in the application for search warrant establishes probable cause, but to determine from the totality of the circumstances whether there is probable cause.' " *St. Marks*, ¶ 22 (second alteration in original) (quoting *State v. Kuneff*, 1998 MT 287, ¶ 27, 291 Mont. 474, ¶ 27, 970 P.2d 556, ¶ 27, in turn citing *Gates*, 462 U.S. at 238, 103 S.Ct. at 2332). In other words, a deficiency in one individual factual assertion is

56

not necessarily fatal to a finding of probable cause, since other facts presented in the application may compensate for that deficiency.

¶117 This is not to say, however, that we do not look at each individual fact set forth in the application. Obviously, the totality of the circumstances cannot be assessed without first analyzing the probative value of the various facts that make up the totality. Indeed, the totality-of-the-circumstances approach contemplates "a balanced assessment of the relative weights" of all the facts presented in the application. *Gates*, 462 U.S. at 234, 103 S.Ct. at 2330; *see also State v. Gray*, 2001 MT 250, ¶ 13, 307 Mont. 124, ¶ 13, 38 P.3d 775, ¶ 13 (Under the totality-of-the-circumstances approach, "the judge evaluates *the facts* asserted within the four corners of the application and makes a practical, common-sense decision as to whether there is a fair probability that incriminating items will be found in the place to which entry is sought." (emphasis added)). Thus, each of Fiddler's fourteen factual assertions, which are numbered below for ease of reference, will be analyzed sequentially to determine its relative weight in the totality of the circumstances.

¶118 As a framework for this discussion, it is helpful to sketch the general propositions for which Fiddler's assertions apparently were offered:

- Farren Galpin knows how to manufacture methamphetamine, and he taught CI#14 and Cory Minez how to do so (Assertions 1, 2, and 3).

- Galpin also taught Sheridan, whom he once dated, how to manufacture methamphetamine (Assertions 3 and 4).

- Sheridan has acquired ingredients and possessed apparatus consistent with the manufacture of methamphetamine (Assertions 5, 6, 7, 11, and 12).

- Sheridan has engaged in the manufacture of methamphetamine (Assertions 6, 8, 9, 10, and 12).

- Since at least November 7, 2001, Sheridan has resided at least part-time at Barnaby's residence (Assertions 8 and 9).

- Sheridan has operated a methamphetamine lab at Barnaby's residence and at another location (Assertions 9 and 10, and inferences from Assertion 13).

- There presently (February 11, 2002) are ingredients and apparatus associated with the production of methamphetamine in "the residence, outbuildings, and numerous junk vehicles" on Barnaby's property (inferences from Assertions 9, 10, and 13).

- The persons who supplied this information are reliable and their information is reliable (Assertion 14).

¶119  Assertions 1 and 2.  On February 22, 2000, Lt. Les Clairmont ("Clairmont") interviewed "CI#14,"[6] who stated that he had been taught how to manufacture methamphetamine by one Farren Galpin ("Galpin") in August 1999.  On February 24, 2000, during an interview with Clairmont, Fiddler, and Investigator C. Couture ("Couture"), CI#14 reaffirmed that Galpin had taught him how to manufacture meth. CI#14 also disclosed that Galpin had taught one Cory Minez ("Minez") how to manufacture meth.  CI#14 offered to take Fiddler and Couture to the locations (which Fiddler listed in the application) where Galpin had been manufacturing meth and storing

_____

[6] Incidentally, Fiddler later disclosed at Barnaby's trial that CI#14 and Sheridan are one and the same and that Fiddler and Sheridan were related through marriage.

58

his meth labs, and he apparently disclosed that he had "personally observed" the meth labs at these locations. During the interview, CI#14 "spoke very freely" about producing methamphetamine, and he evinced extensive knowledge about the process.

¶120 Analysis: Why should the reviewing judge believe CI#14's information? We have held that a reviewing judicial officer cannot just assume that an informant is credible; rather, the applicant must provide a basis for such a finding—e.g., a sworn statement by the applicant that the specific informant has given reliable and accurate information in the past, or independent corroboration of the informant's current information. *See Reesman*, ¶¶ 29-32, 35; *State v. Kaluza* (1995), 272 Mont. 404, 410, 411, 901 P.2d 107, 111; *State v. Wilson* (1992), 254 Mont. 317, 319, 837 P.2d 1346, 1347; *State v. Walston* (1989), 236 Mont. 218, 222-23, 768 P.2d 1387, 1390. Here, Fiddler provided no facts whatsoever concerning CI#14's veracity. Granted, CI#14 offered to take Couture and Fiddler to the locations where Galpin had been manufacturing meth and storing his meth labs, and CI#14 indicated that he had "personally observed" the labs at these locations; however, we are not told whether Fiddler and/or Couture actually went to these locations and, if so, what they found there.

¶121 Fiddler did assert, in what seems to be an afterthought near the end of his application (Assertion 14), that "[t]he informants mentioned in this application have given reliable information in the past" and that "[a]ll have been proven reliable with corroborating information that resulted in arrests from the information they provided." This catchall, however, is of dubious value, as discussed in detail below. But even assuming CI#14's information was reliable, the fact that Galpin had taught CI#14 and

Minez how to manufacture meth had absolutely no bearing on the search of Barnaby's home and property. Thus, his information was entitled to no weight in the probable cause analysis as it pertained to Barnaby's residence.[7]

¶122 <u>Assertion 3</u>. On March 10, 2000, Minez was arrested for production of methamphetamine. During an interview with Fiddler and Couture, Minez disclosed that he had been taught how to manufacture meth by Galpin and that Galpin had also taught Sheridan how to manufacture meth. In addition, Minez stated that "there was a time" when Sheridan and Galpin were dating.

¶123 <u>Analysis</u>: As with the information provided by CI#14, Fiddler provided no facts bearing on Minez's veracity. Granted, Minez's admission that Galpin had taught him how to manufacture meth is an indicator of reliability with respect to Minez's own criminal activities, given that he had been arrested for meth production, *see Reesman*, ¶ 33 (discussing admissions against interest); however, this is not a basis on which to presume the reliability of Minez's information concerning Sheridan's meth-cooking education and her relationship with Galpin (which, from what appears in the application, was unrelated to Minez's activities). How did Minez know that Galpin had taught Sheridan how to manufacture meth? How did he know that Galpin and Sheridan had

_____

[7] As an aside, we are also not given any facts concerning the basis of CI#14's knowledge that Galpin taught Minez how to cook meth. As it turns out, Fiddler's failure to do so is unimportant, since Minez disclosed this fact himself in Assertion 3 and since Minez's meth-cooking education is, in any event, irrelevant to the probable cause determination. But this omission is typical of the manner in which this application was drafted. As will be seen below, few of the tips set forth in Fiddler's application are worthy of any weight by themselves; they only gain a semblance of credibility when considered in conjunction with other tips. The issue, therefore, is whether a collection of unsupported tips from informants of unknown veracity can add up to probable cause to search a person's home.

dated? There are no facts in the application indicating how Minez came by this information. Nor are there any facts indicating why Fiddler found Minez's information to be reliable. (Again, the catchall afterthought in Assertion 14 will be discussed in more detail below.) Thus, Minez's information was entitled to little weight in the probable cause analysis.

¶124 Assertion 4. In July 2000, Couture was contacted by a "concerned citizen" who reported, based on "first hand knowledge and personal observations," that Sheridan had been dating Galpin and that Galpin had taught Sheridan how to manufacture meth. Fiddler notes here that "Galpin is currently serving an extensive sentence after having been convicted of the production of Methamphetamine."

¶125 Analysis: Here, we are presented with what appears to be a non-anonymous informant providing firsthand information, the reliability of which is based on the informant's status as a "concerned citizen." We have distinguished "the concerned citizen who reports a chance encounter with crime as a civic duty" from "the confidential informant who works with police by reporting on the illegal activities of others." *State v. Martinez*, 2003 MT 65, ¶ 34, 314 Mont. 434, ¶ 34, 67 P.3d 207, ¶ 34. We have also stated that an informant who was "motivated by 'good citizenship' " to disclose incriminating information is presumed reliable, *see Reesman*, ¶ 34, whereas other informants enjoy no such presumption of veracity, *see Reesman*, ¶ 32.

¶126 However, in order to ascertain whether a person was motivated by "good citizenship"—and, thus, may be deemed a "concerned citizen"—the nature of the circumstances under which she came by the incriminating information must be set forth

61

in the application. *State v. Beaupre*, 2004 MT 300, ¶ 43, 323 Mont. 413, ¶ 43, 102 P.3d 504, ¶ 43; *State v. Olson*, 2003 MT 61, ¶ 27, 314 Mont. 402, ¶ 27, 66 P.3d 297, ¶ 27; *Reesman*, ¶ 34; *State v. Valley* (1992), 252 Mont. 489, 493, 830 P.2d 1255, 1258. In other words, simply labeling a person a "concerned citizen" does not determine the true nature of that person or the type of scrutiny that must be imposed on her and her information by the reviewing court. *See Reesman*, ¶¶ 32, 34.

¶127 Here, the only indicator that this informant may have been motivated by good citizenship is the "concerned citizen" label assigned to him/her by Fiddler. Yet, Fiddler divulged no factual basis for his labeling this person as such, and the circumstances under which this person came by his/her information suggests that he/she was *not* a "concerned citizen" at all. Specifically, it is highly suspect that this informant had such intimate knowledge of Sheridan's meth-cooking education and her personal relationship with Galpin. One cannot help but question whether "a chance encounter with crime" really was the source of his/her "first hand knowledge and personal observations."

¶128 Fiddler created further ambiguity as to the status of this informant through his arbitrary use of labels throughout his application. For instance, he assigned the "concerned citizen" label to the informants referenced in Assertions 4, 9, and 13, but in Assertion 13, he used the label "concerned citizen" interchangeably with the label "citizen informant," and he assigned this latter term to the informants referenced in Assertions 6 and 10. Of course, it is possible that Fiddler intended both "concerned citizen" and "citizen informant" to mean a person who was motivated by good citizenship to disclose incriminating information gleaned from a chance encounter with crime.

Indeed, we have used the term "citizen informant" to refer to such a person, *see Valley*, 252 Mont. at 493, 830 P.2d at 1258, and the Court proceeds under this assumption in the case at hand, *see* ¶ 8.  The problem, however, is that Fiddler provided no factual support in the application for either label, and his catchall in Assertion 14 suggests that the persons labeled as "concerned citizen" or "citizen informant" are neither.

¶129  Specifically, Fiddler states in Assertion 14 that "[t]he informants mentioned in this application have given reliable information in the past" and "[a]ll have been proven reliable with corroborating information that resulted in arrests from the information they provided."  It is not clear whether "[t]he informants mentioned in this application" encompasses the "concerned citizens" and "citizen informants" referenced in Assertions 4, 6, 9, 10, and 13; but if it does, then it seems all the more likely, in light of what Fiddler states in Assertion 14, that these persons were informants "who work[ed] with police by reporting on the illegal activities of others," not citizens "who report[ed] . . . chance encounter[s] with crime as a civic duty," *Martinez*, ¶ 34.  In any event, a determination of probable cause cannot rest on the reviewing judicial officer's indulgence in assumptions concerning the accuracy of the search warrant applicant's labeling—particularly where the label used implicates a *presumption* of reliability.

¶130  Thus, given Fiddler's ambiguous use of the label "concerned citizen," as well as the glaring lack of facts from which a magistrate could conclude that the informant cited in Assertion 4 (and the informants cited in Assertions 6, 9, 10, and 13, for that matter) was indeed "motivated by good citizenship" to disclose information he/she had learned from "a chance encounter with crime," crediting this person's information as reliable

would be wholly unwarranted, absent other indicia of reliability. Indeed, it would be a mere ratification of Fiddler's unsubstantiated labeling, something neither the Fourth Amendment nor Article II, Sections 10 and 11, tolerates.

¶131 Assertion 5. On May 18, 2001, Sheridan was detained for shoplifting suphedrine tablets at a Target store in Missoula. During his investigation, Officer Brester of the Missoula City Police Department spoke with employee Micah Morris, who explained the circumstances under which he had detained Sheridan and stated that he suspected Sheridan of stealing suphedrine tablets on other occasions. Sheridan, in response to questioning by Officer Brester, admitted to removing five boxes of suphedrine tablets on this date and to taking additional boxes of suphedrine tablets from Target on other occasions.

¶132 Analysis: Given Sheridan's admission against interest, this tip is reliable. *See Reesman*, ¶ 33.

¶133 Assertion 6. On July 18, 2001, Fiddler spoke with a "citizen informant" who had been "involved" with Sheridan. The informant disclosed that he had found on his property a box labeled "June's Stuff" and that inside this box he had found acetone, red devil lye, toluene, coffee filters, and several hot plates (all of which, Fiddler notes, "are consistent with the production of Methamphetamine"). The informant also reported that in the period of time that Sheridan had lived on his property, he had found "that the white paint inside [his] closet had gotten a slight brown tint to it and that the carpet in one of the corners was stained." (Fiddler notes here that it is "common in the production of Methamphetamine to stain materials brown (iodine).") Finally, the informant told

Fiddler that he recalled having found empty suphedrine boxes in Sheridan's vehicle and that he suspected that Sheridan "is concealing items used to produce Methamphetamine in her vehicle's trunk" since "she would never let him any where close to the vehicle's trunk." From what the informant "had heard about the production of Methamphetamine he believed that [Sheridan] had been involved with the production of the drug."

¶134 Analysis: Whether this person is supposed to be a "concerned citizen" or a "confidential informant"—an important distinction, as just discussed, since reliability may be presumed with the former but not with the latter—is not clear. Notably, this person had been "involved" with Sheridan—how, we are not told, except that Sheridan once lived on his property—suggesting that his information was derived from more than just "a chance encounter with crime," *Martinez*, ¶ 34. Moreover, Sheridan apparently damaged the informant's property, and the nature of their relationship sounds somewhat aloof, if not antagonistic, all of which suggests that the informant's motives were questionable—a possibility Fiddler does not address in his application.

¶135 But even assuming this informant was acting as a "concerned citizen" when Fiddler spoke with him, the factual information (as opposed to the suspicions) he imparted—namely, that at some point in time, Sheridan lived on his property; that during that period of time, his closet was discolored in a manner consistent with the presence of iodine; and that at some point after Sheridan lived on his property, he found a box labeled "June's Stuff" in which he found items consistent with meth production—if taken as true, establishes only that at some point in time, Sheridan possessed ingredients and apparatus consistent with the manufacture of methamphetamine. This information is of little

probative value in establishing probable cause to search Barnaby's house. And as for the informant's uncorroborated conjecture—based on "what he had heard about the production of Methamphetamine"—that Sheridan at some point in time was "involved with the production of the drug," this is of even less value in establishing probable cause to search Barnaby's residence.

¶136  Assertion 7.  On October 17, 2001, while at the Ace Hardware store in Ronan, Northwest Drug Task Force Agent Jody Durham ("Durham") observed "a female" purchasing two cans of toluol (a chemical, Fiddler notes, that is a common solvent found in the production of methamphetamine). Durham believed that this was odd, and thus he reported it to the other members of the task force, along with the vehicle plate the female was driving. Durham later identified Sheridan (in a photograph) as the female who had purchased the toluol.

¶137  Analysis:  Given the investigation by Durham and Fiddler of Durham's observation, this tip is reliable. *See Reesman*, ¶¶ 33, 43-45.

¶138  Assertion 8.  On November 5, 2001, Flathead Tribal Police Officer Brian Fyant ("Fyant") advised Fiddler that Sheridan resides part of the time at her parents' home, that Sheridan had kept an eye on the home while her parents were out of town for approximately two weeks, and that Sheridan's parents became ill with sinus problems shortly after returning home. Fiddler notes here that "it is common for people to suffer from similar sinus problems when they have been exposed to the production of Methamphetamine or have been exposed to where the production of Methamphetamine actually took place."

¶139 <u>Analysis</u>: Based on Fyant's information, Fiddler insinuates that Sheridan manufactured meth in her parents' house during their two-week absence. We are not told, however, when and how Fyant came by his information. Is it based on his personal observations? Is it bar talk? Did he (or Fiddler, for that matter) actually speak with Sheridan's parents? Is the information even current?

¶140 Moreover, Fiddler's reasoning leaves much to be desired. Sheridan's parents could have just as conceivably become ill with sinus problems because they caught a flu bug during their trip. Or, as long as we are speculating, perhaps Fyant mistook the parents' symptoms (assuming he actually observed them) for hay fever. Maybe the parents had just returned from a city with a high pollen count. Unless we are willing to presume that most sinus afflictions result from proximity to meth labs, Fyant's information is wholly unconvincing. As with much of his application, Fiddler apparently would have the reviewing judicial officer simply ratify his hypothesis without any supporting facts or investigation on his part whatsoever.

¶141 <u>Assertion 9</u>. On November 7, 2001, Fiddler was contacted by a "concerned citizen" who reported that "Sheridan is living with a 'Barnaby'" at "the Barnaby residence on 'dirty corner' near Cold Water Lane." (This is the first mention of Barnaby in the warrant application.) This person also reported that "they believed" that Sheridan was "operating a Methamphetamine lab at the Barnaby residence and at a residence in the Dixon area."

¶142 <u>Analysis</u>: It is not clear from Fiddler's use of the pronoun "they" whether he is referring to more than one informant. That point aside, what are some of the underlying

67

circumstances from which the informant(s) reached the conclusion that Sheridan was operating a meth lab at Barnaby's residence? And what are some of the underlying circumstances from which Fiddler concluded that the informant(s) was (were) credible or that his/her/their information was reliable? Fiddler was required to provide some facts bearing on these two issues. He did not.

¶143 Indeed, the only information bearing on the credibility of the informant(s) is the "concerned citizen" label assigned by Fiddler; however, we have no basis on which to judge whether this characterization is accurate. Again, simply labeling a person a "concerned citizen" does not determine the true nature of that person or the type of scrutiny that must be imposed on her and her information by the reviewing judicial officer. *State v. Beaupre*, 2004 MT 300, ¶ 43, 323 Mont. 413, ¶ 43, 102 P.3d 504, ¶ 43; *State v. Olson*, 2003 MT 61, ¶ 27, 314 Mont. 402, ¶ 27, 66 P.3d 297, ¶ 27; *Reesman*, ¶ 34; *State v. Valley* (1992), 252 Mont. 489, 493, 830 P.2d 1255, 1258. It would help if Fiddler had explained how this informant's (these informants') "chance encounter with crime" led him/her/them to a belief that a meth lab was in operation at Barnaby's residence. As it is, however, the suspicion imparted by this person (these persons) at most warranted further investigation; it was not entitled to significant weight in the probable cause analysis.

¶144 <u>Assertion 10</u>. On November 28, 2001, Fiddler was contacted by a "citizen informant" who reported that Sheridan "was operating a Methamphetamine lab at the Barnaby residence near 'dirty-corner', and possibly at another residence near the St. Ignatius area."

68

¶145 <u>Analysis</u>: As with the "citizen informant" referenced in Assertion 6, we do not know whether this person was a "concerned citizen" or a "confidential informant." But even assuming, for the sake of argument, that he/she was motivated by good citizenship, nothing in the application discloses the circumstances under which he/she came by his/her information. Indeed, we are left to imagine a "chance encounter with crime" from which this "citizen informant" gleaned that Sheridan was operating a meth lab at the Barnaby residence and possibly at another residence. Perhaps this person was a utility company employee who just happened to observe the meth operation while lawfully on the premises. Or, maybe he/she was someone who was there to purchase drugs and subsequently decided to become an informant. As far as the application discloses, this person is the same person referenced in Assertion 9 reporting the same information that he/she had reported to Fiddler fourteen days earlier.

¶146 The point is that a tip does not gain credibility simply because we can dream up reasonable scenarios in which the "citizen informant" came by his/her information. Those facts—and facts supporting Fiddler's implicit conclusion that the informant and his/her information were reliable—should have been set forth in the application. As it was, however, the reviewing judge had "no way of ascertaining whether this tip was rumor, speculation, vendetta, reprisal, or gossip. It is contrary to common sense that this information is a basis for probable cause to search a citizen's home and invade his privacy." *Valley*, 252 Mont. at 494, 830 P.2d at 1258.

¶147 <u>Assertions 11 and 12</u>. On January 15, 2002, Agent Couture made contact with "a female from the Family Health Pharmacy" to see if there had been anyone in buying

"large or odd amounts" of pseudoephedrine or ephedrine products. The female identified Sheridan in a photo lineup as the person who "comes in at least once a week and purchases ephedrine products." (Fiddler notes here that "to produce Methamphetamine one would need some type of ephedrine product.") The female also stated that Sheridan "usually has a little girl with her with long blonde hair when she comes in."

¶148 On January 17, 2002, Agent Durham returned to the Family Health Pharmacy with a photograph of Sheridan's daughter, whom the pharmacist identified as the little girl seen with Sheridan when she was purchasing ephedrine products. The pharmacist also told Durham "that she suspected Sheridan of illicit activity involving the ephedrine product purchases due to certain indicators including: physical appearance of skin under Sheridan's eyes, Sheridan acting very 'jittery', Sheridan always pays in cash and never requests a receipt."

¶149 Analysis: In stark contrast to the information provided by the various unidentified "concerned citizens" and "citizen informants" mentioned throughout Fiddler's application, the information imparted by the female and the pharmacist here seems reliable, given the detailed circumstances under which they came by that information (observing Sheridan and her daughter come into the pharmacy at least once a week to purchase ephedrine products), the pharmacist's detailed observations of Sheridan's unusual appearance and behavior, and the investigation/corroboration conducted by Couture and Durham (the photo lineup and the photograph of Sheridan's daughter).[8] To

---

[8] This is one of the few instances in the application (Assertion 7 being another) in which the information set forth by Fiddler is explicitly associated with police investigation or

be sure, the magistrate is left to speculate as to the amount of pseudoephedrine and ephedrine that Sheridan purchased (Fiddler does not disclose the meaning of "large or odd amounts"); but the fact that she went into the pharmacy to buy ephedrine products relatively often is established. Given these factors, these tips were entitled to substantial weight in the probable cause analysis.

¶150 Assertion 13. Also on January 17, 2002, Fiddler made contact with a "concerned citizen" (also referred to by Fiddler as a "citizen informant" and a "citizen"), who had "personally viewed" some "odd events" at Barnaby's residence. Specifically, the informant reported the following: that he knew Sheridan and the vehicle that belonged to her; that Sheridan's vehicle "spends a lot of time at the Barnaby residence"; that he "has even seen someone pull the vehicle into the Barnaby drive, back all of the way up to the door, and begin un-loading stuff from the trunk of the Sheridan vehicle"; that Sheridan's vehicle "has been spending a lot of time at the Barnaby residence in the past two months"; that since that time, "things have been strange"; that "a make shift barrier has been built out of blue tarps and black plastic between the blue home and the yellow home" (a reference to the two homes located on Barnaby's property) "so that a person could not see them un-loading items from the Sheridan vehicle or see the movement from home to home"; that "before Sheridan's arrival to the Barnaby home there was a fire

---

corroboration. Couture and Durham initiated their contacts with the female and the pharmacist, and they followed up with a second visit to confirm the identity of the person (Sheridan) who had been purchasing ephedrine products at the pharmacy. By contrast, Fiddler and/or Couture were contacted by the persons referenced in Assertions 4, 9, and 10; Assertions 6, 8, and 13 are ambiguous on this point; and there is no indication that Fiddler corroborated any of the information provided by these informants.

going only every so often, like once or twice a year, out side the home (cultural fire-sweat house)," but that "in the past two months a fire is burning out side the home almost constantly"; that "during times when there is strange activity, there is a fire burning outside"; and that there is "a lot of traffic to and from the Barnaby residence at all hours of the day and night, and only staying for a short amount of time."

¶151 Analysis: This tip is arguably the most important in the entire application. Yet, Fiddler did not disclose the underlying circumstances from which he concluded that this person's information was reliable. The application references no independent corroboration or investigation on his part whatsoever. Indeed, as far as we know, the activities described by this person had all ceased by the time Fiddler submitted his search warrant application nearly four weeks later on February 11, 2002.[9]

¶152 Furthermore, as discussed above with respect to the informants referenced in Assertions 4, 6, 9, and 10, we do not know whether Fiddler's characterizations of this informant as a "concerned citizen" and "citizen informant" are accurate, since Fiddler did not disclose any facts bearing on this issue. (He only stated that he had "made contact with a concerned citizen" who "had personally viewed some odd events happening at the [Barnaby] residence.") As noted above (see ¶ 128), it is possible that Fiddler intended both "concerned citizen" and "citizen informant" to mean a person who was motivated by good citizenship to disclose incriminating information gleaned from a chance encounter

---

[9] As it turns out, Fiddler did conduct surveillance on Barnaby's residence in late 2001 and/or early 2002. However, none of the information he gathered during this period was listed within the four corners of his search warrant application. When asked at Barnaby's trial about this omission, Fiddler explained that he "didn't feel it was evidence."

with crime. On the other hand, this may be a person who worked with Fiddler by reporting on the illegal activities of Sheridan. Again, we do not know, since Fiddler provided no factual support in the application for the labels he used. But even assuming this informant was motivated by good citizenship, Fiddler's reliance on this tip is a prime example of an officer's trying to establish probable cause on the basis of hunches, suspicions, and innuendo derived from otherwise innocent conduct, as opposed to evidence of actual criminal activity or innocent activity that is suspicious when associated with alleged criminal activity, *see State v. Griggs*, 2001 MT 211, ¶¶ 46, 50, 306 Mont. 366, ¶¶ 46, 50, 34 P.3d 101, ¶¶ 46, 50.

¶153   First, the citizen reported seeing "someone" unloading "stuff" from the trunk of Sheridan's vehicle. Was this on just one occasion? When did it occur? And what was the "stuff" being unloaded? It could have been perfectly legal "stuff"; it could have been illicit "stuff"; it even could have been "stuff" to cook meth. As it is, because Fiddler did not disclose (if he even knew) what sort of "stuff" was being unloaded from Sheridan's vehicle, the reviewing judge was forced to speculate that the "stuff" was the proper object of a search of Barnaby's home. We ought not to sanction search warrant applications seeking to search for and seize "stuff" from a person's home—particularly when it appears, as here, that the purpose for seizing such "stuff" is to ascertain, in the first instance, whether it is contraband or evidence of a crime.

¶154   The citizen also reported that things have been "strange" at the Barnaby residence over the past two months. For instance, he observed that a makeshift barrier had been constructed out of blue tarps and black plastic between the blue home and the yellow

home.  The citizen opined that Sheridan and Barnaby built the barrier "so that a person could not see them un-loading items from the Sheridan vehicle or see the movement from home to home."  Curiously, notwithstanding this barrier, the informant somehow knew what was going on behind it:  the unloading of "stuff" from Sheridan's vehicle and movement from home to home.  Or did the informant simply assume that the barrier had been erected for the purpose of hiding illicit activities?  For all he knew, Sheridan and Barnaby erected this barrier for the purpose of preventing snowdrifts alongside the houses.  Or perhaps they erected the barrier to gain some privacy from nosy neighbors.  Whatever their reason, the point here is that the reviewing judge was expected to simply infer criminal activity at the Barnaby residence from otherwise innocuous conduct.

¶155  Notably, Fiddler acknowledged at Barnaby's trial that he "never said [putting tarps up] was unusual."  Rather, "[t]hat was something that the informant said.  That's why it's listed on the search warrant application."  Yet, Fiddler's reliance on *the informant's* belief that this activity was "strange" is all the more reason for him to provide the reviewing judge with facts bearing on the informant's veracity.  Moreover, if Fiddler himself did not find such activity to be unusual, then further investigation into whether such activity was indicative of Sheridan's manufacturing meth at Barnaby's house was called for.

¶156  Also "strange" in the citizen's view was the fact that since Sheridan's arrival, a fire was burning "almost constantly" outside the home.  This activity, however, as with erecting a barrier, is perfectly legal.  Lastly, the citizen reported "a lot" of short-stay

traffic to and from the Barnaby residence day and night. Again, such activity is open to numerous interpretations—some lawful, some unlawful.

¶157 Finally, assuming that Barnaby and Sheridan in fact unloaded "stuff" from the trunk of her vehicle on one or more occasions, that they did so behind a makeshift barrier, that they kept a fire burning outside the home almost constantly, and that there was a lot of traffic to and from the Barnaby residence "at all hours of the day and night," these facts rise only to the level of suspicion of illicit activities. They certainly do not rise to the level under Article II, Sections 10 and 11, "at which [Barnaby's] interest in privacy must yield to the governmental interest in investigating criminal behavior by searching for incriminating items" in Barnaby's home. *State v. Sundberg* (1988), 235 Mont. 115, 119, 765 P.2d 736, 739.

¶158 Assertion 14. In closing, Fiddler stated as follows: "The informants mentioned in this application have given reliable information in the past. All have been proven reliable with corroborating information that resulted in arrests from the information they provided. All of the above informants are separate and apart from each other, and are not aware of the others' participation."

¶159 Analysis: The presence of this catchall—the applicability of which is unclear[10]—reveals why Fiddler provided the reviewing judge with no factual grounds on which to assess the reliability of the informants discussed above: he presumed that he could

---

[10] There is some ambiguity in Fiddler's reference to the "informants mentioned in this application." Is he referring only to the persons who he labeled as "informants," or is he using the term generically to encompass all of the persons, besides his colleagues, who provided him with the information set forth in his application (Assertions 1 through 6 and 9 through 13)?

instead provide a general assurance at the end of the application that all of the foregoing factual assertions are reliable. Until today, there was no support for this technique in any of our case law. Rather, as explained above, we require individualized assessments of reliability.

¶160 Furthermore, as discussed in some detail already (*see* ¶¶ 128-29), Fiddler's catchall makes his arbitrary and inaccurate use of labels apparent. Tellingly, he did not characterize "[t]he informants mentioned in this application" as persons "who report[ed] . . . chance encounter[s] with crime as a civic duty." Rather, he characterized them as persons who "have given reliable information in the past" and "have been proven reliable with corroborating information that resulted in arrests from the information they provided." This is a description of persons who work with police, reporting on the illegal activities of others, not persons who are motivated by good citizenship to report chance encounters with crime. *See Reesman*, ¶ 32; *State v. Martinez*, 2003 MT 65, ¶ 34, 314 Mont. 434, ¶ 34, 67 P.3d 207, ¶ 34. Thus, the various "concerned citizens" and "citizen informants" referenced throughout Fiddler's application do not fit the definition of concerned citizens at all.

¶161 This clarification is important since, as explained above, the assessment of information provided by a concerned citizen is quite different from the assessment of information provided by other informants. A person who is motivated by "good citizenship"—which the reviewing judicial officer cannot possibly ascertain unless the circumstances by which the person's information became known are disclosed in the application—is presumed to be telling the truth. *Reesman*, ¶ 34. Other informants, by

contrast, enjoy no such presumption. *See Reesman*, ¶¶ 32, 35. For this reason, it is essential that the applicant properly characterize each person whose information he sets forth in the application *and* that he provide facts which support these characterizations. Fiddler did not do so; accordingly, we cannot reasonably presume the reliability of the tips provided by the persons he labeled as "concerned citizens" and "citizen informants."

¶162 Having assessed the relative probative value of each individual assertion in Fiddler's search warrant application, I next assess the totality of the application.

### C. The Totality of Fiddler's Application for Search Warrant

¶163 Judge McNeil's task was to determine whether, given all the circumstances set forth in Fiddler's application, there was a fair probability that evidence of the crimes of criminal possession of dangerous drugs and criminal production or manufacture of dangerous drugs would be found in the residence, outbuildings, and numerous junk vehicles on Barnaby's property. Integral to this inquiry, he had to assess the relative weight of each factual assertion set forth in Fiddler's application (*see* ¶¶ 116-17 above), mindful of the heightened standard of persuasion mandated by Article II, Sections 10 and 11. The relative weight of each factual assertion, in turn, depended on the various indicia of reliability attending (or not attending) it—i.e., the veracity and basis of knowledge of the person supplying the information, any corresponding investigative or corroborative efforts, and any related information, set forth elsewhere in the application, tending to bolster the assertion (*see* ¶¶ 95-97 above).

¶164 Correspondingly, our task as a reviewing court is to ensure that the judge had a substantial basis for concluding that probable cause existed. *Reesman*, ¶ 19; *Gates*, 462

77

U.S. at 238-39, 103 S.Ct. at 2332. In doing so, we pay great deference to the judge's probable cause determination. *Reesman*, ¶ 19. Such deference, however, is not boundless:

> It is clear, first, that the deference accorded to a magistrate's finding of probable cause does not preclude inquiry into the knowing or reckless falsity of the affidavit on which that determination was based. Second, the courts must also insist that the magistrate purport to "perform his 'neutral and detached' function and not serve merely as a rubber stamp for the police." A magistrate failing to "manifest that neutrality and detachment demanded of a judicial officer when presented with a warrant application" and who acts instead as "an adjunct law enforcement officer" cannot provide valid authorization for an otherwise unconstitutional search.

> Third, reviewing courts will not defer to a warrant based on an affidavit that does not "provide the magistrate with a substantial basis for determining the existence of probable cause." "Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." Even if the warrant application was supported by more than a "bare bones" affidavit, a reviewing court may properly conclude that, notwithstanding the deference that magistrates deserve, the warrant was invalid because the magistrate's probable-cause determination reflected an improper analysis of the totality of the circumstances, or because the form of the warrant was improper in some respect.

*United States v. Leon* (1984), 468 U.S. 897, 914-15, 104 S.Ct. 3405, 3416-17 (citations and footnotes omitted).

¶165 Thus, we must *review*—and not simply defer to—Judge McNeil's determination of probable cause. More specifically, we must determine whether Fiddler provided the judge with sufficient information to allow him to determine probable cause and whether the judge's probable-cause determination reflected a proper analysis of the totality of the circumstances. In this review, we draw every reasonable inference possible to support Judge McNeil's determination, *Reesman*, ¶ 19, which does not mean blindly accepting

conclusory labels and assertions in the search warrant application but, rather, means "deducing a logical consequence from [the facts presented]," Black's Law Dictionary 793 (8th ed. 2004).

¶166  Assessing Fiddler's application under this approach, the inferences he asked Judge McNeil to draw—that Sheridan was operating a meth lab at Barnaby's residence and that there were ingredients and apparatus associated with the production of meth in "the residence, outbuildings, and numerous junk vehicles" on Barnaby's property on or about February 11, 2002—while plausible, were improperly and insufficiently supported. Reduced to its essentials, Fiddler's application disclosed merely that Sheridan was purchasing, and at times stealing, suphedrine tablets, toluol, and "large or odd amounts" of pseudoephedrine or ephedrine; that she had a reputation for manufacturing meth; and that she had been living part-time with Barnaby.  Significantly, there is nothing in the application that implicates Barnaby in any criminal conduct; rather, the search of his home was based on the inference that evidence of Sheridan's illicit activities was present on his property.

¶167  In this regard, the Court points out that the warrant application included "credible information of Sheridan's involvement in the production of methamphetamines," ¶ 31, and "reliable information" of Sheridan's frequent—or "at least part-time"—presence at Barnaby's residence, ¶ 34.  Yet, none of this "credible" and "reliable" information links Sheridan's meth production to Barnaby's residence.  In other words, even if it was true that Sheridan resided part-time at the Barnaby residence in late 2001 and early 2002, that she knew how to manufacture meth, that she had acquired ingredients and possessed

79

apparatus consistent with the manufacture of meth at various times in the past, and that she had engaged in the manufacture of meth at various times in the past, it does not necessarily follow that evidence of such illicit conduct would be found on Barnaby's property on February 11, 2002. Certainly, these assumptions do not rise to the level of probable cause to search his home. *See State v. Griffin*, 2004 MT 331, ¶ 24, 324 Mont. 143, ¶ 24, 102 P.3d 1206, ¶ 24 ("Just because a [driver] has a pipe in his pocket with untested white residue on it, does not mean his vehicle will contain evidence of a drug offense.").

¶168 The Court acknowledges "that Sheridan's mere presence at the house does not amount to sufficient probable cause to search Barnaby's residence." ¶ 36; *see also* ¶ 33 ("We agree that it does not follow in all cases, 'simply from the existence of probable cause to believe a suspect guilty, there is also probable cause to search his residence.'" (quoting *State v. Kaluza* (1993), 262 Mont. 360, 362, 865 P.2d 263, 264)). Thus, the Court cites *State v. Gray*, 2001 MT 250, 307 Mont. 124, 38 P.3d 775, and *State v. St. Marks*, 2002 MT 285, 312 Mont. 468, 59 P.3d 1113, for the proposition that criminal conduct by Sheridan may be "impute[d]" to Barnaby. *See* ¶ 35. Yet, aside from the fact that these cases are readily distinguishable from the case at hand, the Court's reasoning is analytically flawed: imputation of Sheridan's suspicious activities to Barnaby does not *establish* a criminal undertaking at his house; rather, it *depends* on the existence of one. For instance, in *Gray*, the suspicious activity supposedly imputed to Gray was the building of a room by Gray's associate, Wallace, in the upper portion of Gray's residence to facilitate Gray's marijuana grow operation. *Gray*, ¶¶ 4, 21. Obviously, this activity by

Wallace, who had a criminal history involving dangerous drugs, pertained directly to the search of Gray's residence. Likewise, in *St. Marks*, the search warrant application disclosed that both St. Marks and his associate, Torres, were engaged *together* in dealing drugs. *St. Marks*, ¶ 5. Thus, Torres's arrest and possession of large amounts of cocaine—the very drug St. Marks and Torres allegedly had been selling—"provided an indicia of reliability concerning [the confidential informant's] statements about the alleged criminal activity of St. Marks." *St. Marks*, ¶ 37.

¶169 In the case at hand, by contrast, Fiddler's application discloses no illicit activity whatsoever on the part of Barnaby, much less Barnaby's participation in Sheridan's suspicious activities. Not surprisingly, therefore, the Court sets forth no factual basis for imputing these activities to Barnaby; it simply imputes them. Yet, as stated above, the premises that Sheridan lived part-time with Barnaby and was involved in the production of meth do not, by themselves, establish a fair probability that evidence of the latter would be found *in Barnaby's home* on February 11, 2002. Rather, the crucial link in this chain comes from the informants referenced in Assertions 9, 10, and 13, who, as set forth above, reported the following information: that Sheridan is living with Barnaby at the Barnaby residence and is operating a meth lab *at this location* and at a residence in the Dixon area (Assertion 9, the "concerned citizen" who contacted Fiddler on November 7, 2001); that Sheridan is operating a meth lab *at the Barnaby residence* and possibly at another residence in the St. Ignatius area (Assertion 10, the "citizen informant" who contacted Fiddler on November 28, 2001); and that "things have been strange" at the Barnaby residence "in the past two months" (Assertion 13, the person, labeled as both a

"concerned citizen" and a "citizen informant," with whom Fiddler made contact on January 17, 2002).

¶170 Relying on these three assertions (*compare* ¶ 37 *with* ¶¶ 141, 144, 150), the Court " 'infer[s]' " probable cause to believe that evidence of Sheridan's illicit activities was located in Barnaby's residence from the "suspicious and illegal" activities allegedly occurring there, ¶¶ 33, 37. I might be inclined to agree with this reasoning were it not for the fact that the informants who described the purportedly suspicious and illegal activities in Assertions 9, 10, and 13 are of unknown reliability, as are their tips; and bare, unsubstantiated suspicions are not a sufficient basis on which to issue a search warrant, *State v. Bennett* (1972), 158 Mont. 496, 499, 493 P.2d 1077, 1078 ("Probable cause . . . has been distinguished as being *more than bare suspicion*." (emphasis added) (citing *Brinegar v. United States* (1949), 338 U.S. 160, 175, 69 S.Ct. 1302, 1310)).

¶171 The flaw in the Court's reasoning—indeed, in its approach to this entire case—is apparent from the question it seeks to answer. According to the Court, we must determine whether Sheridan's involvement in the production of methamphetamines, her continued presence at Barnaby's house, the two reports that Sheridan operated a meth lab at Barnaby's house, and the report of suspicious activity at Barnaby's house since Sheridan's arrival amount to a substantial basis for determining whether probable cause supported the issuance of the search warrant for Barnaby's home. ¶ 39. The answer to this question, of course, is yes, this information *does* amount to a substantial basis for determining whether probable cause supported the issuance of the search warrant—but *only if* the information is worthy of belief. Thus, the Court simply has answered the

wrong question, which is whether Assertions 9, 10, and 13 are worthy of belief, either individually or collectively.

¶172   Unquestionably, Assertions 9 and 10, had they been properly corroborated, would have established probable cause to search Barnaby's residence within a reasonable time after the tips were received in November 2001.  As it is, however, these naked allegations are even less probative than the anonymous letter received by the police in *Gates* (which related an assortment of details concerning the Gateses' alleged criminal activities that the investigating detective then corroborated in major part).   Are these informants honest?  Is their information reliable?  As discussed several times already, we are unable to ascertain whether Fiddler's characterizations of these persons as a "concerned citizen" and a "citizen informant," respectively, are accurate.   Furthermore, as the Court acknowledges (*see* ¶ 13), Fiddler failed to state the source of or basis for these informants' allegations that Sheridan was operating a meth lab at Barnaby's residence. Were the allegations rumor, speculation, vendetta, reprisal, gossip, and/or bar talk?  We are left to wonder, as Judge McNeil should have, since Fiddler neither corroborated this information nor set forth a factual basis on which to conclude that the tips were worthy of any weight in the totality-of-the-circumstances analysis.   Thus, by themselves, these assertions do not support a finding of probable cause.

¶173   The same is true of Assertion 13.   Again, there is no factual basis in the application for crediting Fiddler's use of the labels "concerned citizen" and "citizen informant."   But even if the person referenced in Assertion 13 was motivated by good citizenship to disclose incriminating information gained through a chance encounter with

crime or is one of Fiddler's informants who "have given reliable information in the past" and "have been proven reliable with corroborating information that resulted in arrests from the information they provided" (the Assertion 14 catchall), the events he observed, though they may have been "odd" to him, were not unlawful.

¶174 Thus, the only remaining question is whether Assertions 9, 10, and 13, *taken together*, add up to probable cause to search Barnaby's home. In this regard, the Court correctly notes that "[f]actors that possess little probative value on their own, when considered under the totality of the circumstances test, can provide support for a determination of substantial evidence to conclude probable cause existed when considered in combination with other information." ¶ 39. Indeed, a deficiency in an informant's information is not necessarily fatal to a finding of probable cause if other circumstances set forth in the application compensate for the deficiency—which is precisely the point of the totality-of-the-circumstances approach.

¶175 For instance, as discussed earlier, a deficiency in an informant's veracity may be compensated for, in determining the overall reliability of his tip, by a strong showing as to his basis of knowledge. Similarly, a deficiency in an informant's basis of knowledge may be compensated for by a strong showing as to his veracity; and a deficiency in his veracity and basis of knowledge may be compensated for by independent corroboration of his tip. *See Gates*, 462 U.S. at 233-34, 241-42, 103 S.Ct. at 2329-30, 2334. In the same vein, a tip possessing little probative value on its own may bolster, or be bolstered by, related and more reliable information set forth elsewhere in the warrant application. *See State v. Gray*, 2001 MT 250, ¶¶ 17, 21, 307 Mont. 124, ¶¶ 17, 21, 38 P.3d 775, ¶¶ 17,

21; *State v. Rinehart* (1993), 262 Mont. 204, 211, 864 P.2d 1219, 1223; *State v. Holstine* (1993), 260 Mont. 310, 315, 860 P.2d 110, 113; *State v. Campbell* (1992), 254 Mont. 425, 428, 838 P.2d 427, 429; *Gates*, 462 U.S. at 233, 103 S.Ct. at 2329.

¶176  In applying these principles to Fiddler's application, however, the Court distorts the meaning of "*compensate* for the deficiency," concluding that three grossly deficient tips (Assertions 9, 10, and 13), when considered together, can magically nullify each other's shortcomings and add up to a fair probability that evidence of a crime will be found in the place to be searched.  *See* ¶¶ 37, 46.  In other words, the Court adopts an approach under which a collection of assertions each possessing negligible probative value on their own can, *in sufficient numbers*, add up to probable cause.  Thus, while one anonymous Crimestoppers' tip is not adequate to support probable cause, *see Rinehart*, 262 Mont. at 211, 864 P.2d at 1223, three are under the Court's new standard.

¶177  This apparently is the result of the Court's "simply overrul[ing]" in our search and seizure jurisprudence "the proposition set forth in *Reesman* that independent police work represents the only method of corroboration under the totality of the circumstances test," which the Court characterizes as "an unduly restrictive rule that never should have been imposed."  ¶¶ 42, 45.  Although the Court does not specify what other methods of corroboration are proper, its analysis suggests that unsubstantiated tips from informants about whom we are told nothing can corroborate each other to such an extent that probable cause is established, leaving one to question whether the Court's admonishment to law enforcement "to corroborate independently information from sources of

questionable reliability," ¶ 42, is merely lip service, or a directive that is applicable on an ad hoc basis—but obviously not in this case.

¶178   In any event, the Court's novel "0 + 0 + 0 = Probable Cause" approach not only finds no support in *Gates* or any of our case law, but also renders the constitutional protections against unreasonable searches and seizures hollow formalisms.   Article II, Sections 10 and 11, require that the factual assertions set forth in a warrant application be stringently buttressed such that the reviewing judicial officer has a concrete and independent sense that contraband or evidence of a crime will be found in the place to be searched (*see* ¶ 90 above).   Notwithstanding this constitutional mandate, the Court today reduces the level of persuasion necessary to establish probable cause to issue a search warrant in this State to a standard that arguably does not even satisfy the Fourth Amendment.   The fact is that the report of one informant about whom we are told nothing and the conjecture of two other informants about whom we are told nothing add up to very little—certainly not a concrete and independent sense that contraband or evidence of a crime will be found in the place to be searched.   "In determining probability, it is not the number of statements, tips or events that is determinative relative to the common sense approach, it is the probative force of one, some or all of them.   Insufficient data to establish probable cause is not strengthened by number or repetition."   *Valley*, 252 Mont. at 493, 830 P.2d at 1258.   The Court's contrary conclusion renders the greater right to privacy that exists under Article II, Section 10, a practical nullity in the search and seizure context.

¶179 But even if it could be said that Assertions 9, 10, and 13 have probative force when considered together, the facts that would then be established by these three tips are untimely vis-à-vis the date of Fiddler's search warrant application. "The factors supporting probable cause must not be stale and they must indicate that the contraband or evidence would *presently* be at the place searched." *Holstine*, 260 Mont. at 314, 860 P.2d at 113 (emphasis added). "An 'affidavit must set forth facts sufficient to show that a law is being violated *at the time the warrant is issued*.' " *State v. Meyer*, 2004 MT 272, ¶ 25, 323 Mont. 173, ¶ 25, 99 P.3d 185, ¶ 25 (emphasis added) (quoting *State ex rel. Townsend v. District Ct. of Fourth J. D.* (1975), 168 Mont. 357, 362, 543 P.2d 193, 196).

> Where the affidavit recites a mere isolated violation [of the law] it would not be unreasonable to imply that probable cause dwindles rather quickly with the passage of time. However, where the affidavit properly recites facts indicating activity of a protracted and continuous nature, a course of conduct, the passage of time becomes less significant.

*Campbell*, 254 Mont. at 428, 838 P.2d at 429 (internal quotation marks omitted) (quoting *State v. O'Neill* (1984), 208 Mont. 386, 395, 679 P.2d 760, 765); *see also State v. Anderson*, 1999 MT 60, ¶ 14, 293 Mont. 490, ¶ 14, 977 P.2d 983, ¶ 14.

¶180 In the case at hand, the activities described in Assertions 9, 10, and 13 were not long-established or of a protracted or continuous nature relative to the amount of time that passed between Fiddler's receiving these tips and his submitting his search warrant application. On November 5, 2001, Officer Fyant reported that Sheridan was living part-time at her parents' home (Assertion 8). On November 7, 2001, a "concerned citizen" reported that Sheridan was living at the Barnaby residence (Assertion 9). And on January 17, 2002, an informant reported that Sheridan's vehicle had been spending a lot of time at

the Barnaby residence "in the past two months" (Assertion 13). Thus, it seems that for approximately two months, beginning in November 2001, Sheridan lived part-time or, at least, "spen[t] a lot of time" at Barnaby's residence.

¶181 But there is no indication whether she continued to do so after January 17, 2002—a crucial fact, since the basis for searching Barnaby's house four weeks later was Sheridan's alleged meth-related activities there. Similarly, there is no indication whether the meth production reported on November 7 and November 28, 2001 (Assertions 9 and 10) and the "strange" things reported on January 17, 2002 (Assertion 13) were still occurring on or about February 11, 2002 (the date of Fiddler's application). Even an investigation by Fiddler that was "less complete than would be desirable," yet proximate to February 11, 2002, could have satisfied the timeliness requirement. *See State v. Crowder* (1991), 248 Mont. 169, 173-74, 810 P.2d 299, 302. As it is, however, his application discloses no corroboration whatsoever of the information set forth in Assertions 9, 10, and 13 and no reasonable basis for presuming that Sheridan was still cooking meth at Barnaby's house. Thus, as far as we know from Fiddler's application, the illicit activities allegedly occurring on Barnaby's property between November 2001 and January 2002 had all ceased by February 11, 2002, and Sheridan was living full-time at her parents' house and manufacturing all of her meth there.

¶182 In sum, what we are dealing with are three informants about whom we know absolutely nothing, whose information was obtained from unknown sources, and whose observations were not corroborated, *but* whose allegations—that Sheridan was cooking meth at Barnaby's residence, where "odd" events have taken place—comprised the

88

essential basis for a finding of probable cause to search his home. To be sure, their tips are inflammatory; however, bare suspicion and innuendo derived from uncorroborated observations of unknown informants are not a basis on which to invade our citizens' homes, and Assertions 9, 10, and 13—taken together with the other assertions in the application—do not rise to the level of persuasion required under Article II, Sections 10 and 11, to establish probable cause to issue a search warrant.

## CONCLUSION

¶183 Judge McNeil did not have a substantial basis for concluding that probable cause existed to search Barnaby's home and surrounding property. Fiddler's application for search warrant relied on nothing more than innuendo, suspicion, and judicial ratification. With the exception of Assertions 5, 7, 11, and 12, none of the factual assertions—at least none of the *crucial* factual assertions—set forth in his application was investigated or corroborated, and he provided no facts whatsoever concerning the veracity of the persons whose information he imparted. Rather, he relied on a catchall near the end of his application that all of his informants were reliable. Notably, while all of these persons had been proven reliable with corroborating information "in the past," they were not so proven on this occasion. *Cf. Gates*, 462 U.S. at 239, 103 S.Ct. at 2332-33 ("An officer's statement that '[a]ffiants have received reliable information from a credible person and do believe' that heroin is stored in a home, is . . . inadequate." (alteration in original)). As stated above, "[the reviewing judicial officer's] action cannot be a mere ratification of the bare conclusions of others." *Gates*, 462 U.S. at 239, 103 S.Ct. at 2333.

¶184 For these reasons, I cannot agree with the Court's approach here. I do not believe that any appellate court—much less this Court, which is bound by the greater protections afforded under Article II, Sections 10 and 11, of the Montana Constitution—should enable the sort of police work evident here. The courts cannot become foot soldiers in the war on drugs at the expense of their independent role as guardians of the Constitution. "The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards." *Almeida-Sanchez v. United States* (1973), 413 U.S. 266, 273, 93 S.Ct. 2535, 2540. As Justice Jackson observed, soon after his return from the Nuremberg Trials (*see Almeida-Sanchez*, 413 U.S. at 274, 93 S.Ct. at 2540):

> These [Fourth Amendment rights], I protest, are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government. And one need only briefly to have dwelt and worked among a people possessed of many admirable qualities but deprived of these rights to know that the human personality deteriorates and dignity and self-reliance disappear where homes, persons and possessions are subject at any hour to unheralded search and seizure by the police.

*Brinegar*, 338 U.S. at 180-81, 69 S.Ct. at 1313 (Jackson, J., joined by Frankfurter and Murphy, JJ., dissenting).

¶185 This Court's duty to enforce these rights in Montana is all the more compelling given the broader right to privacy guaranteed by Article II, Section 10. While it is difficult to do so in cases such as this, where evidence of illicit activities was found in the

place searched, the reality is that the contours of the right to privacy vis-à-vis the government's interest in ferreting out crime is most often, if not always, given meaning in such contexts.

> [T]he right to be secure against searches and seizures is one of the most difficult to protect. Since the officers are themselves the chief invaders, there is no enforcement outside of court.
>
> Only occasional and more flagrant abuses come to the attention of the courts, and then only those where the search and seizure yields incriminating evidence and the defendant is at least sufficiently compromised to be indicted. If the officers raid a home, an office, or stop and search an automobile but find nothing incriminating, this invasion of the personal liberty of the innocent too often finds no practical redress. There may be, and I am convinced that there are, many unlawful searches of homes and automobiles of innocent people which turn up nothing incriminating, in which no arrest is made, about which courts do nothing, and about which we never hear.
>
> Courts can protect the innocent against such invasions only indirectly and through the medium of excluding evidence obtained against those who frequently are guilty. . . . [A] search against Brinegar's car must be regarded as a search of the car of Everyman.

*Brinegar*, 338 U.S. at 181, 69 S.Ct. at 1313-14 (Jackson, J., joined by Frankfurter and Murphy, JJ., dissenting). Likewise, a search of Barnaby's home must be regarded as a search of the home of every Montanan. In sanctioning Fiddler's search warrant application, the Court places in jeopardy the right of *all* Montanans to be secure against unreasonable searches and seizures.

¶186 With respect to *Reesman*, our opinion in that case did not establish any new law or impose any new obligations on police, prosecutors, or judges. To the contrary, as explained above, the opinion merely pulled together in one place extant precedent and unambiguously articulated existing Montana search and seizure jurisprudence with

respect to the use of various types of information in search warrant applications, all in the hope and expectation that the police would investigate suspected criminal activity more thoroughly, that police and prosecutors would draft more concise applications for search warrants, and that the lower courts would be more vigilant in assessing the constitutional requirement of probable cause, faithful to the greater rights of individual privacy enjoyed by all Montanans under Article II, Sections 10 and 11.

¶187   As stated already, the Court's Opinion, in my view, only pays mere lip service to the principles and approach of *Reesman* and the cases it cites.  The Court's deviation from the *Reesman* framework is not "slight[]," ¶ 41; it is substantial.  Today's Opinion overrules—or, at a minimum, calls into doubt—an array of precedents that includes *State v. Meyer*, 2004 MT 272, ¶¶ 25, 31, 323 Mont. 173, ¶¶ 25, 31, 99 P.3d 185, ¶¶ 25, 31; *State v. Bowman*, 2004 MT 119, ¶ 30, 321 Mont. 176, ¶ 30, 89 P.3d 986, ¶ 30; *State v. Olson*, 2003 MT 61, ¶¶ 25-27, 314 Mont. 402, ¶¶ 25-27, 66 P.3d 297, ¶¶ 25-27; *State v. Grams*, 2002 MT 188, ¶¶ 17-19, 311 Mont. 102, ¶¶ 17-19, 53 P.3d 897, ¶¶ 17-19; *State v. Gray*, 2001 MT 250, ¶ 17, 307 Mont. 124, ¶ 17, 38 P.3d 775, ¶ 17; *State v. Worrall*, 1999 MT 55, ¶¶ 20-22, 293 Mont. 439, ¶¶ 20-22, 976 P.2d 968, ¶¶ 20-22; *State v. Oleson*, 1998 MT 130, ¶¶ 13-15, 289 Mont. 139, ¶¶ 13-15, 959 P.2d 503, ¶¶ 13-15; *State v. Adams* (1997), 284 Mont. 25, 36-37, 943 P.2d 955, 961-62; *State v. Kaluza* (1995), 272 Mont. 404, 410-11, 901 P.2d 107, 111; *State v. Lott* (1995), 272 Mont. 195, 199, 900 P.2d 306, 309; *State v. Rinehart* (1993), 262 Mont. 204, 209-14, 864 P.2d 1219, 1222-25; *State v. Holstine* (1993), 260 Mont. 310, 314-15, 860 P.2d 110, 112-13; *State v. Campbell* (1992), 254 Mont. 425, 427-29, 838 P.2d 427, 429; *State v. Wilson* (1992), 254 Mont. 317, 319-

20, 837 P.2d 1346, 1347-48; *State v. Valley* (1992), 252 Mont. 489, 492-94, 830 P.2d 1255, 1257-58; *State v. Crowder* (1991), 248 Mont. 169, 173-74, 810 P.2d 299, 302; *State v. Seaman* (1989), 236 Mont. 466, 472, 771 P.2d 950, 953; *State v. Walston* (1989), 236 Mont. 218, 222-23, 768 P.2d 1387, 1390; *State v. Sundberg* (1988), 235 Mont. 115, 120-21, 765 P.2d 736, 740; *State v. Isom* (1982), 196 Mont. 330, 342-43, 641 P.2d 417, 424; and *State v. Olson* (1979), 180 Mont. 151, 154-55, 589 P.2d 663, 665.

¶188   The Court claims that this Dissent "mischaracterizes" the impact of its decision on *Reesman*.   ¶ 44.   It assures us that it "strike[s] not even a glancing blow upon the continued vitality of *Meyer*," ¶ 44; that it "fully agree[s]" with the probable cause analyses in *Bowman*, *Olson*, and *Grams*, ¶ 45; and that it has "simply overrule[d]" in our search and seizure jurisprudence "an unduly restrictive rule that never should have been imposed" by *Reesman*, ¶ 45.  These assurances, however, miss the point.  I am not saying that the Court is overruling the *results* in *Meyer*, *Bowman*, *Olson*, *Grams*, and the other cases cited above.   Rather, I am saying that by analyzing Fiddler's search warrant application pursuant to an approach that is so utterly contrary to the step-by-step framework we set forth in *Reesman* (*compare* ¶¶ 31-37 & 46 of the Court's Opinion *with Reesman*, ¶¶ 28-35), the Court necessarily and unavoidably calls into doubt any case that follows the *Reesman* approach, not to mention the cases from which the *Reesman* framework was derived.

¶189   Indeed, the Court acknowledges as much—albeit implicitly.  Laboring under the misconception that *Reesman* does not permit a tip possessing little probative value on its own to bolster, or be bolstered by, related and more reliable information set forth

elsewhere in the search warrant application, the Court reduces *Reesman* to mere "useful guidelines," which the Court then dismisses as "impractical" in cases such as this, where the police receive tips of dubious reliability from informants of unknown credibility.

¶ 41. If the Court can bring itself only to pay lip service to the *Reesman* framework, then it should just overrule the *Reesman* line of cases explicitly.

¶190 The war on drugs must not become a war on the constitutional right of Montanans to be free from unreasonable searches and seizures in their homes. "The Fourth Amendment is a charter of freedom that should be protected against incremental erosion."[11] So much more, then, should this Court support, protect, and defend the greater protections afforded by Article II, Sections 10 and 11, of Montana's Constitution.

¶191 For all of these reasons, I vigorously dissent.

/S/ JAMES C. NELSON

---

[11] Professor Mark Rothstein, speaking on the topic of "The Social and Legal Implications of DNA Database Expansion" at the National Symposium on DNA Fingerprinting and Civil Liberties, sponsored by the American Society of Law, Medicine and Ethics (Boston, Mass., May 11, 2006).